## ENGEL ET AL. *v.* VITALE ET AL.

No. 468.   Argued April 3, 1962.—Decided June 25, 1962.

*William J. Butler* argued the cause for petitioners. With him on the briefs was *Stanley Geller*.

*Bertram B. Daiker* argued the cause for respondents. With him on the briefs was *Wilford E. Neier*.

*Porter R. Chandler* argued the cause for intervenors-respondents.   With him on the briefs were *Thomas J. Ford* and *Richard E. Nolan*.

*Charles A. Brind* filed a brief for the Board of Regents of the University of the State of New York, as *amicus curiae,* in opposition to the petition for certiorari.

Briefs of *amici curiae,* urging reversal, were filed by *Herbert A. Wolff, Leo Rosen* and *Nancy Wechsler* for the American Ethical Union; *Louis Caplan, Edwin J. Lukas, Paul Hartman, Theodore Leskes* and *Sol Rabkin* for the American Jewish Committee et al.; and *Leo Pfeffer, Lewis H. Weinstein, Albert Wald, Shad Polier* and *Samuel Lawrence Brennglass* for the Synagogue Council of America et al.

A brief of *amici curiae,* urging affirmance, was filed by *Roger D. Foley,* Attorney General of Nevada, *Robert*

422

*Pickrell,* Attorney General of Arizona, *Frank Holt,* Attorney General of Arkansas, *Albert L. Coles,* Attorney General of Connecticut, *Richard W. Ervin,* Attorney General of Florida, *Eugene Cook,* Attorney General of Georgia, *Frank Benson,* Attorney General of Idaho, *Edwin K. Steers,* Attorney General of Indiana, *William M. Ferguson,* Attorney General of Kansas, *Jack P. F. Gremillion,* Attorney General of Louisiana, *Thomas B. Finan,* Attorney General of Maryland, *Joe T. Patterson,* Attorney General of Mississippi, *William Maynard,* Attorney General of New Hampshire, *Arthur J. Sills,* Attorney General of New Jersey, *Earl E. Hartley,* Attorney General of New Mexico, *Leslie R. Burgum,* Attorney General of North Dakota, *David Stahl,* Attorney General of Pennsylvania, *J. Joseph Nugent,* Attorney General of Rhode Island, *Daniel R. McLeod,* Attorney General of South Carolina, *A. C. Miller,* Attorney General of South Dakota, *Will Wilson,* Attorney General of Texas, and *C. Donald Robertson,* Attorney General of West Virginia.

MR. JUSTICE BLACK delivered the opinion of the Court.

The respondent Board of Education of Union Free School District No. 9, New Hyde Park, New York, acting in its official capacity under state law, directed the School District's principal to cause the following prayer to be said aloud by each class in the presence of a teacher at the beginning of each school day:

> "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country."

This daily procedure was adopted on the recommendation of the State Board of Regents, a governmental agency created by the State Constitution to which the New York Legislature has granted broad supervisory, executive, and

legislative powers over the State's public school system.[1]
These state officials composed the prayer which they
recommended and published as a part of their "State-
ment on Moral and Spiritual Training in the Schools,"
saying: "We believe that this Statement will be sub-
scribed to by all men and women of good will, and we call
upon all of them to aid in giving life to our program."

Shortly after the practice of reciting the Regents'
prayer was adopted by the School District, the parents of
ten pupils brought this action in a New York State Court
insisting that use of this official prayer in the public
schools was contrary to the beliefs, religions, or religious
practices of both themselves and their children. Among
other things, these parents challenged the constitution-
ality of both the state law authorizing the School District
to direct the use of prayer in public schools and the School
District's regulation ordering the recitation of this par-
ticular prayer on the ground that these actions of official
governmental agencies violate that part of the First
Amendment of the Federal Constitution which commands
that "Congress shall make no law respecting an estab-
lishment of religion"—a command which was "made
applicable to the State of New York by the Fourteenth
Amendment of the said Constitution." The New York
Court of Appeals, over the dissents of Judges Dye and
Fuld, sustained an order of the lower state courts which
had upheld the power of New York to use the Regents'
prayer as a part of the daily procedures of its public
schools so long as the schools did not compel any pupil
to join in the prayer over his or his parents' objection.[2]

---

[1] See New York Constitution, Art. V, § 4; New York Education
Law, §§ 101, 120 et seq., 202, 214–219, 224, 245 et seq., 704, and
801 et seq.

[2] 10 N. Y. 2d 174, 176 N. E. 2d 579. The trial court's opinion,
which is reported at 18 Misc. 2d 659, 191 N. Y. S. 2d 453, had
made it clear that the Board of Education must set up some sort

We granted certiorari to review this important decision involving rights protected by the First and Fourteenth Amendments.[3]

We think that by using its public school system to encourage recitation of the Regents' prayer, the State of New York has adopted a practice wholly inconsistent with the Establishment Clause. There can, of course, be no doubt that New York's program of daily classroom invocation of God's blessings as prescribed in the Regents' prayer is a religious activity. It is a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been

---

of procedures to protect those who objected to reciting the prayer: "This is not to say that the rights accorded petitioners and their children under the 'free exercise' clause do not mandate safeguards against such embarrassments and pressures. It is enough on this score, however, that regulations, such as were adopted by New York City's Board of Education in connection with its released time program, be adopted, making clear that neither teachers nor any other school authority may comment on participation or nonparticipation in the exercise nor suggest or require that any posture or language be used or dress be worn or be not used or not worn. Nonparticipation may take the form either of remaining silent during the exercise, or if the parent or child so desires, of being excused entirely from the exercise. Such regulations must also make provision for those nonparticipants who are to be excused from the prayer exercise. The exact provision to be made is a matter for decision by the board, rather than the court, within the framework of constitutional requirements. Within that framework would fall a provision that prayer participants proceed to a common assembly while nonparticipants attend other rooms, or that nonparticipants be permitted to arrive at school a few minutes late or to attend separate opening exercises, or any other method which treats with equality both participants and nonparticipants." 18 Misc. 2d, at 696, 191 N. Y. S. 2d, at 492–493. See also the opinion of the Appellate Division affirming that of the trial court, reported at 11 App. Div. 2d 340, 206 N. Y. S. 2d 183.

[3] 368 U. S. 924.

religious, none of the respondents has denied this and the trial court expressly so found:

"The religious nature of prayer was recognized by Jefferson and has been concurred in by theological writers, the United States Supreme Court and State courts and administrative officials, including New York's Commissioner of Education. A committee of the New York Legislature has agreed.

"The Board of Regents as *amicus curiae,* the respondents and intervenors all concede the religious nature of prayer, but seek to distinguish this prayer because it is based on our spiritual heritage. . . ." [4]

The petitioners contend among other things that the state laws requiring or permitting use of the Regents' prayer must be struck down as a violation of the Establishment Clause because that prayer was composed by governmental officials as a part of a governmental program to further religious beliefs. For this reason, petitioners argue, the State's use of the Regents' prayer in its public school system breaches the constitutional wall of separation between Church and State. We agree with that contention since we think that the constitutional prohibition against laws respecting an establishment of religion must at least mean that in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.

It is a matter of history that this very practice of establishing governmentally composed prayers for religious services was one of the reasons which caused many of our early colonists to leave England and seek religious freedom in America. The Book of Common Prayer,

---

[4] 18 Misc. 2d, at 671–672, 191 N. Y. S. 2d, at 468–469.

which was created under governmental direction and which was approved by Acts of Parliament in 1548 and 1549,[5] set out in minute detail the accepted form and content of prayer and other religious ceremonies to be used in the established, tax-supported Church of England.[6] The controversies over the Book and what should be its content repeatedly threatened to disrupt the peace of that country as the accepted forms of prayer in the established church changed with the views of the particular ruler that happened to be in control at the time.[7] Powerful groups representing some of the varying religious views of the people struggled among themselves to impress their particular views upon the Government and

[5] 2 & 3 Edward VI, c. 1, entitled "An Act for Uniformity of Service and Administration of the Sacraments throughout the Realm"; 3 & 4 Edward VI, c. 10, entitled "An Act for the abolishing and putting away of divers Books and Images."

[6] The provisions of the various versions of the Book of Common Prayer are set out in broad outline in the Encyclopaedia Britannica, Vol. 18 (1957 ed.), pp. 420–423. For a more complete description, see Pullan, The History of the Book of Common Prayer (1900).

[7] The first major revision of the Book of Common Prayer was made in 1552 during the reign of Edward VI. 5 & 6 Edward VI, c. 1. In 1553, Edward VI died and was succeeded by Mary who abolished the Book of Common Prayer entirely. 1 Mary, c. 2. But upon the accession of Elizabeth in 1558, the Book was restored with important alterations from the form it had been given by Edward VI. 1 Elizabeth, c. 2. The resentment to this amended form of the Book was kept firmly under control during the reign of Elizabeth but, upon her death in 1603, a petition signed by more than 1,000 Puritan ministers was presented to King James I asking for further alterations in the Book. Some alterations were made and the Book retained substantially this form until it was completely suppressed again in 1645 as a result of the successful Puritan Revolution. Shortly after the restoration in 1660 of Charles II, the Book was again reintroduced, 13 & 14 Charles II, c. 4, and again with alterations. Rather than accept this form of the Book some 2,000 Puritan ministers vacated their benefices. See generally Pullan, The History of the Book of Common Prayer (1900), pp. vii–xvi; Encyclopaedia Britannica (1957 ed.), Vol. 18, pp. 421–422.

obtain amendments of the Book more suitable to their respective notions of how religious services should be conducted in order that the official religious establishment would advance their particular religious beliefs.[8] Other groups, lacking the necessary political power to influence the Government on the matter, decided to leave England and its established church and seek freedom in America from England's governmentally ordained and supported religion.

It is an unfortunate fact of history that when some of the very groups which had most strenuously opposed the established Church of England found themselves sufficiently in control of colonial governments in this country to write their own prayers into law, they passed laws making their own religion the official religion of their respective colonies.[9] Indeed, as late as the time of the Revolu-

---

[8] For example, the Puritans twice attempted to modify the Book of Common Prayer and once attempted to destroy it. The story of their struggle to modify the Book in the reign of Charles I is vividly summarized in Pullan, History of the Book of Common Prayer, at p. xiii: "The King actively supported those members of the Church of England who were anxious to vindicate its Catholic character and maintain the ceremonial which Elizabeth had approved. Laud, Archbishop of Canterbury, was the leader of this school. Equally resolute in his opposition to the distinctive tenets of Rome and of Geneva, he enjoyed the hatred of both Jesuit and Calvinist. He helped the Scottish bishops, who had made large concessions to the uncouth habits of Presbyterian worship, to draw up a Book of Common Prayer for Scotland. It contained a Communion Office resembling that of the book of 1549. It came into use in 1637, and met with a bitter and barbarous opposition. The vigour of the Scottish Protestants strengthened the hands of their English sympathisers. Laud and Charles were executed, Episcopacy was abolished, the use of the Book of Common Prayer was prohibited."

[9] For a description of some of the laws enacted by early theocratic governments in New England, see Parrington, Main Currents in American Thought (1930), Vol. 1, pp. 5–50; Whipple, Our Ancient Liberties (1927), pp. 63–78; Wertenbaker, The Puritan Oligarchy (1947).

tionary War, there were established churches in at least eight of the thirteen former colonies and established religions in at least four of the other five.[10]   But the successful Revolution against English political domination was shortly followed by intense opposition to the practice of establishing religion by law.   This opposition crystallized rapidly into an effective political force in Virginia where the minority religious groups such as Presbyterians, Lutherans, Quakers and Baptists had gained such strength that the adherents to the established Episcopal Church were actually a minority themselves.   In 1785–1786, those opposed to the established Church, led by James Madison and Thomas Jefferson, who, though themselves not members of any of these dissenting religious groups, opposed all religious establishments by law on grounds of principle, obtained the enactment of the famous "Virginia Bill for Religious Liberty" by which all religious groups were placed on an equal footing so far as the State was concerned.[11]   Similar though less far-reaching

---

[10] The Church of England was the established church of at least five colonies: Maryland, Virginia, North Carolina, South Carolina and Georgia.   There seems to be some controversy as to whether that church was officially established in New York and New Jersey but there is no doubt that it received substantial support from those States.   See Cobb, The Rise of Religious Liberty in America (1902), pp. 338, 408.   In Massachusetts, New Hampshire and Connecticut, the Congregationalist Church was officially established.   In Pennsylvania and Delaware, all Christian sects were treated equally in most situations but Catholics were discriminated against in some respects. See generally Cobb, The Rise of Religious Liberty in America (1902). In Rhode Island all Protestants enjoyed equal privileges but it is not clear whether Catholics were allowed to vote.   Compare Fiske, The Critical Period in American History (1899), p. 76 with Cobb, The Rise of Religious Liberty in America (1902), pp. 437–438.

[11] 12 Hening, Statutes of Virginia (1823), 84, entitled "An act for establishing religious freedom."   The story of the events surrounding the enactment of this law was reviewed in *Everson* v. *Board of Education*, 330 U. S. 1, both by the Court, at pp. 11–13, and in the

legislation was being considered and passed in other States.[12]

By the time of the adoption of the Constitution, our history shows that there was a widespread awareness among many Americans of the dangers of a union of Church and State. These people knew, some of them from bitter personal experience, that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services. They knew the anguish, hardship and bitter strife that could come when zealous religious groups struggled with one another to obtain the Government's stamp of approval from each King, Queen, or Protector that came to temporary power. The Constitution was intended to avert a part of this danger by leaving the government of this country in the hands of the people rather than in the hands of any monarch. But this safeguard was not enough. Our Founders were no more willing to let the content of their prayers and their privilege of praying whenever they pleased be influenced by the ballot box than they were to let these vital matters of personal conscience depend upon the succession of monarchs. The First Amendment was added to the Constitution to stand as a guarantee that neither the power nor the prestige of the Federal Government would be used to control, support or influence the kinds of prayer the American people can say—

---

dissenting opinion of Mr. Justice Rutledge, at pp. 33–42. See also Fiske, The Critical Period in American History (1899), pp. 78–82; James, The Struggle for Religious Liberty in Virginia (1900) ; Thom, The Struggle for Religious Freedom in Virginia: The Baptists (1900) ; Cobb, The Rise of Religious Liberty in America (1902), pp. 74–115, 482–499.

[12] See Cobb, The Rise of Religious Liberty in America (1902), pp. 482–509.

430

that the people's religions must not be subjected to the pressures of government for change each time a new political administration is elected to office. Under that Amendment's prohibition against governmental establishment of religion, as reinforced by the provisions of the Fourteenth Amendment, government in this country, be it state or federal, is without power to prescribe by law any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity.

There can be no doubt that New York's state prayer program officially establishes the religious beliefs embodied in the Regents' prayer. The respondents' argument to the contrary, which is largely based upon the contention that the Regents' prayer is "non-denominational" and the fact that the program, as modified and approved by state courts, does not require all pupils to recite the prayer but permits those who wish to do so to remain silent or be excused from the room, ignores the essential nature of the program's constitutional defects. Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause, as it might from the Free Exercise Clause, of the First Amendment, both of which are operative against the States by virtue of the Fourteenth Amendment. Although these two clauses may in certain instances overlap, they forbid two quite different kinds of governmental encroachment upon religious freedom. The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not. This is not to say, of course, that

laws officially prescribing a particular form of religious worship do not involve coercion of such individuals. When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain. But the purposes underlying the Establishment Clause go much further than that. Its first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion. The history of governmentally established religion, both in England and in this country, showed that whenever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who held contrary beliefs.[13] That same history showed that many people had lost their respect for any religion that had relied upon the support of government to spread its faith.[14] The Establishment Clause

[13] "[A]ttempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general, and to slacken the bands of Society. If it be difficult to execute any law which is not generally deemed necessary or salutary, what must be the case where it is deemed invalid and dangerous? and what may be the effect of so striking an example of impotency in the Government, on its general authority." Memorial and Remonstrance against Religious Assessments, II Writings of Madison 183, 190.

[14] "It is moreover to weaken in those who profess this Religion a pious confidence in its innate excellence, and the patronage of its Author; and to foster in those who still reject it, a suspicion that its friends are too conscious of its fallacies, to trust it to its own merits. . . . [E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation. During almost fifteen centuries, has the legal establishment of Christianity been on trial. What have been its fruits? More or less in all places, pride and indolence in the Clergy; ignorance and servility in the laity; in both, superstition,

432

thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its "unhallowed perversion" by a civil magistrate.[15] Another purpose of the Establishment Clause rested upon an awareness of the historical fact that governmentally established religions and religious persecutions go hand in hand.[16] The Founders knew that only a few years after the Book of Common Prayer became the only accepted form of religious services in the established Church of England, an Act of Uniformity was passed to compel all Englishmen to attend those services and to make it a criminal offense to conduct or attend religious gatherings of any other kind[17]—a law

---

bigotry and persecution. Enquire of the Teachers of Christianity for the ages in which it appeared in its greatest lustre; those of every sect, point to the ages prior to its incorporation with Civil policy." *Id.*, at 187.

[15] Memorial and Remonstrance against Religious Assessments, II Writings of Madison, at 187.

[16] "[T]he proposed establishment is a departure from that generous policy, which, offering an asylum to the persecuted and oppressed of every Nation and Religion, promised a lustre to our country, and an accession to the number of its citizens. What a melancholy mark is the Bill of sudden degeneracy? Instead of holding forth an asylum to the persecuted, it is itself a signal of persecution. . . . Distant as it may be, in its present form, from the Inquisition it differs from it only in degree. The one is the first step, the other the last in the career of intolerance. The magnanimous sufferer under this cruel scourge in foreign Regions, must view the Bill as a Beacon on our Coast, warning him to seek some other haven, where liberty and philanthropy in their due extent may offer a more certain repose from his troubles." *Id.*, at 188.

[17] 5 & 6 Edward VI, c. 1, entitled "An Act for the Uniformity of Service and Administration of Sacraments throughout the Realm." This Act was repealed during the reign of Mary but revived upon the accession of Elizabeth. See note 7, *supra*. The reasons which led to the enactment of this statute were set out in its preamble: "Where there hath been a very godly Order set forth by the Authority of Parliament, for Common Prayer and Administration of the Sacra-

which was consistently flouted by dissenting religious groups in England and which contributed to widespread persecutions of people like John Bunyan who persisted in holding "unlawful [religious] meetings . . . to the great disturbance and distraction of the good subjects of this kingdom . . . ." [18] And they knew that similar persecutions had received the sanction of law in several of the colonies in this country soon after the establishment of official religions in those colonies.[19] It was in large part to get completely away from this sort of systematic religious persecution that the Founders brought into being our Nation, our Constitution, and our Bill of Rights with its prohibition against any governmental establishment of religion. The New York laws officially prescribing the Regents' prayer are inconsistent both with the purposes of the Establishment Clause and with the Establishment Clause itself.

It has been argued that to apply the Constitution in such a way as to prohibit state laws respecting an

---

ments to be used in the Mother Tongue within the Church of *England,* agreeable to the Word of God and the Primitive Church, very comfortable to all good People desiring to live in Christian Conversation, and most profitable to the Estate of this Realm, upon the which the Mercy, Favour and Blessing of Almighty God is in no wise so readily and plenteously poured as by Common Prayers, due using of the Sacraments, and often preaching of the Gospel; with the Devotion of the Hearers: (1) And yet this notwithstanding, a great Number of People in divers Parts of this Realm, following their own Sensuality, and living either without Knowledge or due Fear of God, do wilfully and damnably before Almighty God abstain and refuse to come to their Parish Churches and other Places where Common Prayer, Administration of the Sacraments, and Preaching of the Word of God, is used upon *Sundays* and other Days ordained to be Holydays."

[18] Bunyan's own account of his trial is set forth in A Relation of the Imprisonment of Mr. John Bunyan, reprinted in Grace Abounding and The Pilgrim's Progress (Brown ed. 1907), at 103–132.

[19] For a vivid account of some of these persecutions, see Wertenbaker, The Puritan Oligarchy (1947).

establishment of religious services in public schools is to indicate a hostility toward religion or toward prayer. Nothing, of course, could be more wrong. The history of man is inseparable from the history of religion. And perhaps it is not too much to say that since the beginning of that history many people have devoutly believed that "More things are wrought by prayer than this world dreams of." It was doubtless largely due to men who believed this that there grew up a sentiment that caused men to leave the cross-currents of officially established state religions and religious persecution in Europe and come to this country filled with the hope that they could find a place in which they could pray when they pleased to the God of their faith in the language they chose.[20] And there were men of this same faith in the

[20] Perhaps the best example of the sort of men who came to this country for precisely that reason is Roger Williams, the founder of Rhode Island, who has been described as "the truest Christian amongst many who sincerely desired to be Christian." Parrington, Main Currents in American Thought (1930), Vol. 1, at p. 74. Williams, who was one of the earliest exponents of the doctrine of separation of church and state, believed that separation was necessary in order to protect the church from the danger of destruction which he thought inevitably flowed from control by even the best-intentioned civil authorities: "The unknowing zeale of *Constantine* and other Emperours, did more hurt to *Christ Jesus* his Crowne and Kingdome, then the raging fury of the most bloody *Neroes*. In the *persecutions* of the later, *Christians* were sweet and fragrant, like spice pounded and beaten in morters: But those *good* Emperours, persecuting some erroneous persons, *Arrius, &c.* and advancing the professours of some Truths of Christ (for there was no small number of *Truths* lost in those times) and maintaining their *Religion* by the materiall Sword, I say by this meanes *Christianity* was *ecclipsed,* and the Professors of it fell asleep . . . ." Williams, The Bloudy Tenent, of Persecution, for cause of Conscience, discussed in A Conference betweene Truth and Peace (London, 1644), reprinted in Narragansett Club Publications, Vol. III, p. 184. To Williams, it was no part of the business or competence of a civil magistrate to interfere in religious matters: "[W]hat imprudence and *indiscretion* is it in the most common

power of prayer who led the fight for adoption of our Constitution and also for our Bill of Rights with the very guarantees of religious freedom that forbid the sort of governmental activity which New York has attempted here. These men knew that the First Amendment, which tried to put an end to governmental control of religion and of prayer, was not written to destroy either. They knew rather that it was written to quiet well-justified fears which nearly all of them felt arising out of an awareness that governments of the past had shackled men's tongues to make them speak only the religious thoughts that government wanted them to speak and to pray only to the God that government wanted them to pray to. It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance.[21]

---

affaires of Life, to conceive that *Emperours, Kings* and *Rulers* of the earth must not only be qualified with *politicall* and *state abilities* to *make* and *execute* such *Civill Lawes* which may concerne the common *rights, peace* and *safety* (which is worke and businesse, load and burthen enough for the ablest shoulders in the Commonweal) but also furnished with such *Spirituall* and heavenly *abilities* to governe the *Spirituall* and *Christian Commonweale* . . . ." *Id.*, at 366. See also *id.*, at 136–137.

[21] There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored in this instance.

It is true that New York's establishment of its Regents' prayer as an officially approved religious doctrine of that State does not amount to a total establishment of one particular religious sect to the exclusion of all others—that, indeed, the governmental endorsement of that prayer seems relatively insignificant when compared to the governmental encroachments upon religion which were commonplace 200 years ago. To those who may subscribe to the view that because the Regents' official prayer is so brief and general there can be no danger to religious freedom in its governmental establishment, however, it may be appropriate to say in the words of James Madison, the author of the First Amendment:

> "[I]t is proper to take alarm at the first experiment on our liberties. . . . Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?" [22]

The judgment of the Court of Appeals of New York is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

---

[22] Memorial and Remonstrance against Religious Assessments, II Writings of Madison 183, at 185–186.

MR. JUSTICE DOUGLAS, concurring.

It is customary in deciding a constitutional question to treat it in its narrowest form. Yet at times the setting of the question gives it a form and content which no abstract treatment could give. The point for decision is whether the Government can constitutionally finance a religious exercise. Our system at the federal and state levels is presently honeycombed with such financing.[1] Nevertheless, I think it is an unconstitutional undertaking whatever form it takes.

First, a word as to what this case does not involve.

---

[1] "There are many 'aids' to religion in this country at all levels of government. To mention but a few at the federal level, one might begin by observing that the very First Congress which wrote the First Amendment provided for chaplains in both Houses and in the armed services. There is compulsory chapel at the service academies, and religious services are held in federal hospitals and prisons. The President issues religious proclamations. The Bible is used for the administration of oaths. N. Y. A. and W. P. A. funds were available to parochial schools during the depression. Veterans receiving money under the 'G. I.' Bill of 1944 could attend denominational schools, to which payments were made directly by the government. During World War II, federal money was contributed to denominational schools for the training of nurses. The benefits of the National School Lunch Act are available to students in private as well as public schools. The Hospital Survey and Construction Act of 1946 specifically made money available to non-public hospitals. The slogan 'In God We Trust' is used by the Treasury Department, and Congress recently added God to the pledge of allegiance. There is Bible-reading in the schools of the District of Columbia, and religious instruction is given in the District's National Training School for Boys. Religious organizations are exempt from the federal income tax and are granted postal privileges. Up to defined limits—15 per cent of the adjusted gross income of individuals and 5 per cent of the net income of corporations—contributions to religious organizations are deductible for federal income tax purposes. There are no limits to the deductibility of gifts and bequests to religious institutions made under the federal gift and estate tax laws. This list of federal 'aids' could easily be expanded, and of course there is a long list in each state." Fellman, The Limits of Freedom (1959), pp. 40–41.

Plainly, our Bill of Rights would not permit a State or the Federal Government to adopt an official prayer and penalize anyone who would not utter it. This, however, is not that case, for there is no element of compulsion or coercion in New York's regulation requiring that public schools be opened each day with the following prayer:

"Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country."

The prayer is said upon the commencement of the school day, immediately following the pledge of allegiance to the flag. The prayer is said aloud in the presence of a teacher. who either leads the recitation or selects a student to do so. No student, however, is compelled to take part. The respondents have adopted a regulation which provides that "Neither teachers nor any school authority shall comment on participation or non-participation . . . nor suggest or request that any posture or language be used or dress be worn or be not used or not worn." Provision is also made for excusing children, upon written request of a parent or guardian, from the saying of the prayer or from the room in which the prayer is said. A letter implementing and explaining this regulation has been sent to each taxpayer and parent in the school district. As I read this regulation, a child is free to stand or not stand, to recite or not recite, without fear of reprisal or even comment by the teacher or any other school official.

In short, the only one who need utter the prayer is the teacher; and no teacher is complaining of it. Students can stand mute or even leave the classroom, if they desire.[2]

---

[2] West Point Cadets are required to attend chapel each Sunday. Reg., c. 21, § 2101. The same requirement obtains at the Naval Academy (Reg., c. 9, § 0901, (1) (a) ), and at the Air Force Academy except First Classmen. Catalogue, 1962–1963, p. 110. And see Honey-

*McCollum* v. *Board of Education,* 333 U. S. 203, does
not decide this case. It involved the use of public school
facilities for religious education of students. Students
either had to attend religious instruction or "go to some
other place in the school building for pursuit of their
secular studies. . . . Reports of their presence or absence
were to be made to their secular teachers." *Id.,* at 209.
The influence of the teaching staff was therefore brought to
bear on the student body, to support the instilling of reli-
gious principles. In the present case, school facilities are
used to say the prayer and the teaching staff is employed
to lead the pupils in it. There is, however, no effort at
indoctrination and no attempt at exposition. Prayers
of course may be so long and of such a character as to
amount to an attempt at the religious instruction that was
denied the public schools by the *McCollum* case. But
New York's prayer is of a character that does not involve
any element of proselytizing as in the *McCollum* case.

The question presented by this case is therefore an
extremely narrow one. It is whether New York oversteps
the bounds when it finances a religious exercise.

What New York does on the opening of its public
schools is what we do when we open court. Our Crier
has from the beginning announced the convening of the
Court and then added "God save the United States and
this Honorable Court." That utterance is a supplication,
a prayer in which we, the judges, are free to join, but which
we need not recite any more than the students need recite
the New York prayer.

What New York does on the opening of its public
schools is what each House of Congress [3] does at the open-

---

well, Chaplains of the United States Army (1958); Jorgensen, The
Service of Chaplains to Army Air Units, 1917–1946, Vol. I (1961).

[3] The New York Legislature follows the same procedure. See, *e. g.,*
Vol. 1, N. Y. Assembly Jour., 184th Sess., 1961, p. 8; Vol. 1, N. Y.
Senate Jour., 184th Sess., 1961, p. 5.

ing of each day's business.[4] Reverend Frederick B. Harris is Chaplain of the Senate; Reverend Bernard Braskamp is Chaplain of the House. Guest chaplains of various denominations also officiate.[5]

---

[4] Rules of the Senate provide that each calendar day's session shall open with prayer. See Rule III, Senate Manual, S. Doc. No. 2, 87th Cong., 1st Sess. The same is true of the Rules of the House. See Rule VII, Rules of the House of Representatives, H. R. Doc. No. 459, 86th Cong., 2d Sess. The Chaplains of the Senate and of the House receive $8,810 annually. See 75 Stat. 320, 324.

[5] It would, I assume, make no difference in the present case if a different prayer were said every day or if the ministers of the community rotated, each giving his own prayer. For some of the petitioners in the present case profess no religion.

The Pledge of Allegiance, like the prayer, recognizes the existence of a Supreme Being. Since 1954 it has contained the words "one Nation *under God,* indivisible, with liberty and justice for all." 36 U. S. C. § 172. The House Report recommending the addition of the words "under God" stated that those words in no way run contrary to the First Amendment but recognize "only the guidance of God in our national affairs." H. R. Rep. No. 1693, 83d Cong., 2d Sess., p. 3. And see S. Rep. No. 1287, 83d Cong., 2d Sess. Senator Ferguson, who sponsored the measure in the Senate, pointed out that the words "In God We Trust" are over the entrance to the Senate Chamber. 100 Cong. Rec. 6348. He added:

"I have felt that the Pledge of Allegiance to the Flag which stands for the United States of America should recognize the Creator who we really believe is in control of the destinies of this great Republic.

"It is true that under the Constitution no power is lodged anywhere to establish a religion. This is not an attempt to establish a religion; it has nothing to do with anything of that kind. It relates to belief in God, in whom we sincerely repose our trust. We know that America cannot be defended by guns, planes, and ships alone. Appropriations and expenditures for defense will be of value only if the God under whom we live believes that we are in the right. We should at all times recognize God's province over the lives of our people and over this great Nation." *Ibid.* And see 100 Cong. Rec. 7757 *et seq.* for the debates in the House.

The Act of March 3, 1865, 13 Stat. 517, 518, authorized the phrase "In God We Trust" to be placed on coins. And see 17 Stat. 427. The first mandatory requirement for the use of that motto on coins

In New York the teacher who leads in prayer is on the public payroll; and the time she takes seems minuscule as compared with the salaries appropriated by state legislatures and Congress for chaplains to conduct prayers in the legislative halls. Only a bare fraction of the teacher's time is given to reciting this short 22-word prayer, about the same amount of time that our Crier spends announcing the opening of our sessions and offering a prayer for this Court. Yet for me the principle is the same, no matter how briefly the prayer is said, for in each of the instances given the person praying is a public official on the public payroll, performing a religious exercise in a governmental institution.[6] It is said that the

---

was made by the Act of May 18, 1908, 35 Stat. 164. See H. R. Rep. No. 1106, 60th Cong., 1st Sess.; 42 Cong. Rec. 3384 *et seq.* The use of the motto on all currency and coins was directed by the Act of July 11, 1955, 69 Stat. 290. See H. R. Rep. No. 662, 84th Cong., 1st Sess.; S. Rep. No. 637, 84th Cong., 1st Sess. Moreover, by the Joint Resolution of July 30, 1956, our national motto was declared to be "In God We Trust." 70 Stat. 732. In reporting the Joint Resolution, the Senate Judiciary Committee stated:

"Further official recognition of this motto was given by the adoption of the Star-Spangled Banner as our national anthem. One stanza of our national anthem is as follows:

" 'O, thus be it ever when freemen shall stand
Between their lov'd home and the war's desolation!
Blest with vict'ry and peace may the heav'n rescued land
Praise the power that hath made and preserved us a nation!
Then conquer we must when our cause it is just,
And this be our motto—"In God is our trust."
And the Star-Spangled Banner in triumph shall wave
O'er the land of the free and the home of the brave.'

"In view of these words in our national anthem, it is clear that 'In God we trust' has a strong claim as our national motto." S. Rep. No. 2703, 84th Cong., 2d Sess., p. 2.

[6] The fact that taxpayers do not have standing in the federal courts to raise the issue (*Frothingham* v. *Mellon,* 262 U. S. 447) is of course no justification for drawing a line between what is done in New York on the one hand and on the other what we do and what Congress does in this matter of prayer.

element of coercion is inherent in the giving of this prayer. If that is true here, it is also true of the prayer with which this Court is convened, and of those that open the Congress. Few adults, let alone children, would leave our courtroom or the Senate or the House while those prayers are being given. Every such audience is in a sense a "captive" audience.

At the same time I cannot say that to authorize this prayer is to establish a religion in the strictly historic meaning of those words.[7]   A religion is not established in the usual sense merely by letting those who choose to do so say the prayer that the public school teacher leads. Yet once government finances a religious exercise it inserts a divisive influence into our communities.[8]   The New York Court said that the prayer given does not conform to all of the tenets of the Jewish, Unitarian, and Ethical Culture groups. One of the petitioners is an agnostic.

"We are a religious people whose institutions presuppose a Supreme Being." *Zorach* v. *Clauson,* 343 U. S. 306, 313.   Under our Bill of Rights free play is given for

---

[7] The Court analogizes the present case to those involving the traditional Established Church.   We once had an Established Church, the Anglican.   All baptisms and marriages had to take place there. That church was supported by taxation.   In these and other ways the Anglican Church was favored over the others.   The First Amendment put an end to placing any one church in a preferred position. It ended support of any church or all churches by taxation.   It went further and prevented secular sanction to any religious ceremony, dogma, or rite.   Thus, it prevents civil penalties from being applied against recalcitrants or nonconformists.

[8] Some communities have a Christmas tree purchased with the taxpayers' money.   The tree is sometimes decorated with the words "Peace on earth, goodwill to men."   At other times the authorities draw from a different version of the Bible which says "Peace on earth to men of goodwill."   Christmas, I suppose, is still a religious celebration, not merely a day put on the calendar for the benefit of merchants.

making religion an active force in our lives.[9]   But "if a religious leaven is to be worked into the affairs of our people, it is to be done by individuals and groups, not by the Government." *McGowan* v. *Maryland,* 366 U. S. 420, 563 (dissenting opinion).   By reason of the First Amendment government is commanded "to have no interest in theology or ritual" (*id.,* at 564), for on those matters "government must be neutral." *Ibid.* The First Amendment leaves the Government in a position not of hostility to religion but of neutrality.   The philosophy is that the atheist or agnostic—the nonbeliever—is entitled to go his own way.   The philosophy is that if government interferes in matters spiritual, it will be a divisive force.   The First Amendment teaches that a government neutral in the field of religion better serves all religious interests.

My problem today would be uncomplicated but for *Everson* v. *Board of Education,* 330 U. S. 1, 17, which allowed taxpayers' money to be used to pay "the bus fares of parochial school pupils as a part of a general program under which" the fares of pupils attending public and other schools were also paid.   The *Everson* case seems in retrospect to be out of line with the First Amendment. Its result is appealing, as it allows aid to be given to needy children.   Yet by the same token, public funds could be used to satisfy other needs of children in parochial schools—lunches, books, and tuition being obvious examples.   Mr. Justice Rutledge stated in dissent what I think is durable First Amendment philosophy:

"The reasons underlying the Amendment's policy have not vanished with time or diminished in force.

---

[9] Religion was once deemed to be a function of the public school system.   The Northwest Ordinance, which antedated the First Amendment, provided in Article III that "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

Now as when it was adopted the price of religious freedom is double. It is that the church and religion shall live both within and upon that freedom. There cannot be freedom of religion, safeguarded by the state, and intervention by the church or its agencies in the state's domain or dependency on its largesse. Madison's Remonstrance, Par. 6, 8. The great condition of religious liberty is that it be maintained free from sustenance, as also from other interferences, by the state. For when it comes to rest upon that secular foundation it vanishes with the resting. *Id.,* Par. 7, 8. Public money devoted to payment of religious costs, educational or other, brings the quest for more. It brings too the struggle of sect against sect for the larger share or for any. Here one by numbers alone will benefit most, there another. That is precisely the history of societies which have had an established religion and dissident groups. *Id.,* Par. 8, 11. It is the very thing Jefferson and Madison experienced and sought to guard against, whether in its blunt or in its more screened forms. *Ibid.* The end of such strife cannot be other than to destroy the cherished liberty. The dominating group will achieve the dominant benefit; or all will embroil the state in their dissensions. *Id.,* Par. 11." *Id.,* pp. 53–54.

What New York does with this prayer is a break with that tradition. I therefore join the Court in reversing the judgment below.

Mr. Justice Stewart, dissenting.

A local school board in New York has provided that those pupils who wish to do so may join in a brief prayer at the beginning of each school day, acknowledging their dependence upon God and asking His blessing upon them

and upon their parents, their teachers, and their country. The Court today decides that in permitting this brief nondenominational prayer the school board has violated the Constitution of the United States. I think this decision is wrong.

The Court does not hold, nor could it, that New York has interfered with the free exercise of anybody's religion. For the state courts have made clear that those who object to reciting the prayer must be entirely free of any compulsion to do so, including any "embarrassments and pressures." Cf. *West Virginia State Board of Education* v. *Barnette*, 319 U. S. 624. But the Court says that in permitting school children to say this simple prayer, the New York authorities have established "an official religion."

With all respect, I think the Court has misapplied a great constitutional principle. I cannot see how an "official religion" is established by letting those who want to say a prayer say it. On the contrary, I think that to deny the wish of these school children to join in reciting this prayer is to deny them the opportunity of sharing in the spiritual heritage of our Nation.

The Court's historical review of the quarrels over the Book of Common Prayer in England throws no light for me on the issue before us in this case. England had then and has now an established church. Equally unenlightening, I think, is the history of the early establishment and later rejection of an official church in our own States. For we deal here not with the establishment of a state church, which would, of course, be constitutionally impermissible, but with whether school children who want to begin their day by joining in prayer must be prohibited from doing so. Moreover, I think that the Court's task, in this as in all areas of constitutional adjudication, is not responsibly aided by the uncritical invocation of metaphors like the "wall of separation," a phrase nowhere to

be found in the Constitution. What is relevant to the issue here is not the history of an established church in sixteenth century England or in eighteenth century America, but the history of the religious traditions of our people, reflected in countless practices of the institutions and officials of our government.

At the opening of each day's Session of this Court we stand, while one of our officials invokes the protection of God. Since the days of John Marshall our Crier has said, "God save the United States and this Honorable Court." [1] Both the Senate and the House of Representatives open their daily Sessions with prayer.[2] Each of our Presidents, from George Washington to John F. Kennedy, has upon assuming his Office asked the protection and help of God.[3]

---

[1] See Warren, The Supreme Court in United States History, Vol. 1, p. 469.

[2] See Rule III, Senate Manual, S. Doc. No. 2, 87th Cong., 1st Sess. See Rule VII, Rules of the House of Representatives, H. R. Doc. No. 459, 86th Cong., 2d Sess.

[3] For example:

On April 30, 1789, President George Washington said:

". . . it would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe, who presides in the councils of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes, and may enable every instrument employed in its administration to execute with success the functions allotted to his charge. In tendering this homage to the Great Author of every public and private good, I assure myself that it expresses your sentiments not less than my own, nor those of my fellow-citizens at large less than either. No people can be bound to acknowledge and adore the Invisible Hand which conducts the affairs of men more than those of the United States. . . .

.    .         .         .         .

"Having thus imparted to you my sentiments as they have been awakened by the occasion which brings us together, I shall

take my present leave; but not without resorting once more to the benign Parent of the Human Race in humble supplication that, since He has been pleased to favor the American people with opportunities for deliberating in perfect tranquillity, and dispositions for deciding with unparalleled unanimity on a form of government for the security of their union and the advancement of their happiness, so His divine blessing may be equally *conspicuous* in the enlarged views, the temperate consultations, and the wise measures on which the success of this Government must depend."

On March 4, 1797, President John Adams said:

"And may that Being who is supreme over all, the Patron of Order, the Fountain of Justice, and the Protector in all ages of the world of virtuous liberty, continue His blessing upon this nation and its Government and give it all possible success and duration consistent with the ends of His providence."

On March 4, 1805, President Thomas Jefferson said:

". . . I shall need, too, the favor of that Being in whose hands we are, who led our fathers, as Israel of old, from their native land and planted them in a country flowing with all the necessaries and comforts of life; who has covered our infancy with His providence and our riper years with His wisdom and power, and to whose goodness I ask you to join in supplications with me that He will so enlighten the minds of your servants, guide their councils, and prosper their measures that whatsoever they do shall result in your good, and shall secure to you the peace, friendship, and approbation of all nations."

On March 4, 1809, President James Madison said:

"But the source to which I look . . . is in . . . my fellow-citizens, and in the counsels of those representing them in the other departments associated in the care of the national interests. In these my confidence will under every difficulty be best placed, next to that which we have all been encouraged to feel in the guardianship and guidance of that Almighty Being whose power regulates the destiny of nations, whose blessings have been so conspicuously dispensed to this rising Republic, and to whom we are bound to address our devout gratitude for the past, as well as our fervent supplications and best hopes for the future."

[*Footnote 3 continued on p. 448*]

448

On March 4, 1865, President Abraham Lincoln said:

". . . Fondly do we hope, fervently do we pray, that this mighty scourge of war may speedily pass away. Yet, if God wills that it continue until all the wealth piled by the bondsman's two hundred and fifty years of unrequited toil shall be sunk, and until every drop of blood drawn with the lash shall be paid by another drawn with the sword, as was said three thousand years ago, so still it must be said 'the judgments of the Lord are true and righteous altogether.'

"With malice toward none, with charity for all, with firmness in the right as God gives us to see the right, let us strive on to finish the work we are in, to bind up the nation's wounds, to care for him who shall have borne the battle and for his widow and his orphan, to do all which may achieve and cherish a just and lasting peace among ourselves and with all nations."

On March 4, 1885, President Grover Cleveland said:

". . . And let us not trust to human effort alone, but humbly acknowledging the power and goodness of Almighty God, who presides over the destiny of nations, and who has at all times been revealed in our country's history, let us invoke His aid and His blessing upon our labors."

On March 5, 1917, President Woodrow Wilson said:

". . . I pray God I may be given the wisdom and the prudence to do my duty in the true spirit of this great people."

On March 4, 1933, President Franklin D. Roosevelt said:

"In this dedication of a Nation we humbly ask the blessing of God. May He protect each and every one of us. May He guide me in the days to come."

On January 21, 1957, President Dwight D. Eisenhower said:

"Before all else, we seek, upon our common labor as a nation, the blessings of Almighty God. And the hopes in our hearts fashion the deepest prayers of our whole people."

On January 20, 1961, President John F. Kennedy said:

"The world is very different now. . . . And yet the same revolutionary beliefs for which our forebears fought are still at issue around the globe—the belief that the rights of man come

The Court today says that the state and federal governments are without constitutional power to prescribe any particular form of words to be recited by any group of the American people on any subject touching religion.[4] One of the stanzas of "The Star-Spangled Banner," made our National Anthem by Act of Congress in 1931,[5] contains these verses:

> "Blest with victory and peace, may the heav'n rescued land
>> Praise the Pow'r that hath made and preserved us a nation!
> Then conquer we must, when our cause it is just, And this be our motto 'In God is our Trust.' "

In 1954 Congress added a phrase to the Pledge of Allegiance to the Flag so that it now contains the words "one Nation *under God,* indivisible, with liberty and justice for all."[6] In 1952 Congress enacted legislation calling upon the President each year to proclaim a National Day of Prayer.[7] Since 1865 the words "IN GOD WE TRUST" have been impressed on our coins.[8]

---

not from the generosity of the state but from the hand of God.

.　　　.　　　.　　　.　　　.

"With a good conscience our only sure reward, with history the final judge of our deeds, let us go forth to lead the land we love, asking His blessing and His help, but knowing that here on earth God's work must truly be our own."

[4] My brother DOUGLAS says that the only question before us is whether government "can constitutionally finance a religious exercise." The official chaplains of Congress are paid with public money. So are military chaplains. So are state and federal prison chaplains.

[5] 36 U. S. C. § 170.

[6] 36 U. S. C. § 172.

[7] 36 U. S. C. § 185.

[8] 13 Stat. 517, 518; 17 Stat. 427; 35 Stat. 164; 69 Stat. 290. The current provisions are embodied in 31 U. S. C. §§ 324, 324a.

Countless similar examples could be listed, but there is no need to belabor the obvious.[9]  It was all summed up by this Court just ten years ago in a single sentence: "We are a religious people whose institutions presuppose a Supreme Being." *Zorach* v. *Clauson,* 343 U. S. 306, 313.

I do not believe that this Court, or the Congress, or the President has by the actions and practices I have mentioned established an "official religion" in violation of the Constitution.  And I do not believe the State of New York has done so in this case.  What each has done has been to recognize and to follow the deeply entrenched and highly cherished spiritual traditions of our Nation— traditions which come down to us from those who almost two hundred years ago avowed their "firm Reliance on the Protection of divine Providence" when they proclaimed the freedom and independence of this brave new world.[10]

I dissent.

---

[9] I am at a loss to understand the Court's unsupported *ipse dixit* that these official expressions of religious faith in and reliance upon a Supreme Being "bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored in this instance." See *ante,* p. 435, n. 21.  I can hardly think that the Court means to say that the First Amendment imposes a lesser restriction upon the Federal Government than does the Fourteenth Amendment upon the States.  Or is the Court suggesting that the Constitution permits judges and Congressmen and Presidents to join in prayer, but prohibits school children from doing so?

[10] The Declaration of Independence ends with this sentence: "And for the support of this Declaration, with a firm reliance on the protection of divine Providence, we mutually pledge to each other our Lives, our Fortunes and our sacred Honor."