William and Terry BECK, individually and on behalf of their minor children; Margaret Capron; and John Doe, individually and on behalf of his minor child,

v.

Robert L. McELRATH, in his capacity as Commissioner of Education; Lamar Alexander, in his capacity as Governor of the State of Tennessee; William M. Leech, in his capacity as Attorney General of the State of Tennessee.

No. 82–3577.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 7, 1982.

Lionel Barrett, Jr., Nashville, Tenn., Bruce S. Kramer, Memphis, Tenn., Thomas M. Daniel, Memphis, Tenn., for plaintiffs.

Michael Terry, Deputy Atty. Gen. of Tenn., Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

In this civil action plaintiffs seek declaratory relief pursuant to 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and Article I, Section 3 of the Tennessee Constitution. It is alleged that an enactment by the General Assembly of Tennessee must be declared unconstitutional.

### I.

The challenged provision states:

At the commencement of the first class of each day in all grades in all public schools, the teacher in charge of the room in which such class is held shall announce that a period of silence not to exceed one minute of duration shall be observed for meditation or prayer or personal beliefs and during any such period, silence shall be maintained.

1982 Tenn.Pub. Acts ch. 899, § 1 (amending Tenn.Code Ann. § 49–1922). The basic question presented in this lawsuit concerns whether the General Assembly could enact this amendment in light of the Establishment Clause.

As a preliminary matter, defendants point out that prayer has never been pro-

hibited in public schools, and that those who generally state that prayer is prohibited do so incorrectly. This statement is obviously correct, for "the Free Exercise Clause . . . recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state." *School District v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963). Defendants also point out that the Constitution does not require an anti-religious government. *This statement is also clearly supported by the above-quoted authority.* Moreover, the Supreme Court has expressly noted elsewhere that the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and nonbelievers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them." *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947). Identifying these concepts as constitutional realities, defendants set out to fashion an argument in support of the challenged statute. Such realities under the Free Exercise Clause are not determinative of the issues in this case, however. Defendants recognize, as does the court, that no issue in this case touches upon alleged infringement of rights secured under that clause. To the contrary, it is claimed that the state has attempted to promote, rather than inhibit, religious exercises in the public schools. The Establishment Clause, as an interrelated and complementary provision, prohibits action by the state which transcends the bounds of neutrality on the opposite side of the issue to which the identified realities address themselves. A decision cannot be reached in this case without also looking at the other side of the coin, so to speak, for "[w]hile the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to *anyone,* it has never meant that a majority could use the machinery of the State to practice its beliefs." *Schempp, supra,* 374 U.S. at 226, 83 S.Ct. at 1573.

## II.

■ The history of the First Amendment as it relates to religious freedom has been detailed on numerous occasions. Most commonly recognized is the principle that the framers of the Constitution sought to prevent the establishment of any single denomination as a state church, because it is well known that "[a] large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government favored churches." *Everson, supra,* 330 U.S. at 8, 67 S.Ct. at 508. The story behind the religion clauses goes further, however. With Thomas Jefferson and James Madison as leading proponents of complete individual freedom in matters concerning religion,

> [t]he people [in Virginia], as elsewhere, reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions, or to interfere with the beliefs of any religious individual or group.

*Id.* at 11, 67 S.Ct. at 509. Thus governments in this country are not only powerless to establish an official church; governments in this country are powerless to support, assist, suppress, or hinder religious beliefs in any respect whatsoever. The meaning of the Establishment Clause, in particular, can therefore be stated as follows:

> Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institu-

tions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State." *Id.* at 15–116, 67 S.Ct. at 511–12 (citations omitted). Upon this foundation, the test which generally confronts legislation alleged to contravene the Establishment Clause has been stated as follows:

> [T]o pass muster under the Establishment Clause the law in question first must reflect a clearly secular legislative purpose, second, must have a primary effect that neither advances nor inhibits religion, and, third, must avoid excessive government entanglement with religion.

*Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 774, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973).

### A.

Defendants suggest that the statute merely provides for enforcement of a moment of silence in public schools. This approach begs the preeminent question, however. Plaintiffs do not challenge simply a moment of silence here; they challenge a moment of silence which, by legislative mandate in Tennessee, "shall be observed for meditation or prayer or personal beliefs." It may well be, as defendants contend, that a moment of silence in and of itself is nondiscriminatory and may serve a secular purpose in aid of the educative function. Certainly a statutory enactment is unnecessary to provide for a moment of silence. The court is unable to agree, however, that the statute reflects such a clearly secular purpose. In the abstract it is true that "meditation" and "reflection upon personal beliefs" can be viewed as carrying meanings that do not touch upon religion. Individual terms within a statute are not to be construed in a purely abstract sense or in a vacuum, however. As all terms in the statute are viewed together and accorded

reasonable meaning, it is difficult to escape the conclusion that the legislative purpose was advancement of religious exercises in the classroom. Ordinary principles of statutory construction do not comprehend the straining that defendants would urge upon the court.

At the very best, it might be said that the statute on its face is ambiguous, and that the court should consider underlying legislative history. If that is the case, the record of debate upon this statute is devastating to defendants' position. The overwhelming intent among legislators supporting the bill, including the sponsors, was to establish prayer as a daily fixture in the public schoolrooms of Tennessee. Even if much that was said can be passed off as political rhetoric, it is rhetoric clearly inconsistent with standards set in place by the Constitution, and therefore reflects upon an inappropriate purpose. There were indications that certain legislators have concluded that prayer should be a routine part of a school day because a majority of their constituents support such a practice. But such reliance, even upon the sentiments of a public majority whose existence might be subject to judicial notice, takes no account of the principle that:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to ... freedom of worship ... and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*West Virginia Board of Education v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). If this is not correct, by leaving political favor and majority sentiment to carry the day on all issues we have no need for a Constitution at all, and we might determine our most basic rights by consulting the latest Gallup Poll.

In support of their contention that the legislative purpose was secular in nature, defendants partially quote the comments of Senator Henry. It is instructive to note, however, that Senator Henry was speaking in support of an amendment which would have deleted from the bill any reference to prayer. Senator Henry argued to no avail his conviction that "the prayer proposition I really don't think we ought to legislate." Immediately following his comments another senator rose in opposition to the same amendment and opened his remarks by stating:

If there is one thing the people of this state want, they want prayer in public schools. The fact of the matter is this is a vote on prayer in public schools. Now Senator Henry ... just has a different point of view. But if you want to get recorded as being against prayer in public school, you vote for his amendment.

The amendment was defeated by a vote of 24 to 7, and thus it is quite as likely as not that the Senate intentionally turned away from the secular objective supported by Senator Henry. In any event, his remarks were hardly endorsed by the Senate and certainly do not support a finding of a secular purpose.

Defendants also refer to statements by Senator Dunavant and Senator Davis, each of whom spoke in opposition to Senator Henry's amendment. But Senator Dunavant's remarks consisted for the most part of a defense for the bill based upon the absence of coercion. Senator Davis agreed with Senator Dunavant and echoed his sentiments, indicating that "[t]he kids can pray, which we hope that most of them will, but they don't have to." The real import of their remarks, in other words, appears to be that although the subject legislation would indeed serve to promote prayer in schools, it would be constitutionally acceptable so long as children were not forced to pray. Such reasoning, whether defendants consciously adopt it or not, overlooks the distinction that "a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." *Schempp, supra,* 374 U.S. at

223, 83 S.Ct. at 1572. *See also Engle v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Moreover, it does nothing to dispel the appearance of a legislative purpose directed almost solely toward the promotion of religion, because:

That a child is offered an alternative may reduce the constraint; it does not eliminate the operation óf influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and nonconformity is not an outstanding characteristic of children.

*McCollum v. Board of Education,* 333 U.S. 203, 227, 68 S.Ct. 461, 473, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring).

Certain modifications in the statutory language were approved, ostensibly in an effort to bring that language into line with constitutional requirements. But a mere cursory reading of the legislative history discloses that the purpose for which the statute was enacted remained constant— the legislature sought to set aside a time for daily religious exercises in public schools. Certainly no other purpose is apparent which substantially influenced the legislature as a body, or which can be viewed as more than a "merely adjunctive and supplemental" secular purpose. *De-Spain v. DeKalb County Community School District,* 384 F.2d 836, 839 (7th Cir. 1967), cert. denied, 390 U.S. 906, 88 S.Ct. 815, 19 L.Ed.2d 873 (1968).

### B.

The second factor to be considered under *Nyquist* concerns the primary effect of legislation. Schools were not in session when the hearing in this case was conducted, and no evidence was produced. Nevertheless, the effect of this statute should be examined. *See, e.g., Nyquist, supra* (case resolved on basis of pleadings, without evidentiary hearing). The natural effect must be determined from the face of the statute, if for no other reason because the legislature did not provide any guidelines for implementing its requirements.

The court is convinced that the primary effect of this statute must be the promotion of religious exercises. Stated otherwise, it is presumed that the effect will be that which was intended by the legislature. As a practical matter, the statute's effect may well differ from one classroom to another in the absence of implementing guidelines. For example, some teachers might simply call for a moment of silence; some might call for a moment of silence and instruct students that they are to meditate, pray, or reflect upon their personal beliefs; and some, in straightforward execution of the legislative intent, might instruct students that a time is being provided for them to pray. If, for that matter, teachers merely recite the statute to students and announce that its terms will be followed, the primary effect would appear to be obvious. Unavoidably, students will understand that they are being encouraged not only to be silent, but also to engage in religious exercises. It cannot be seriously argued, and certainly cannot be assured, that nice distinctions concerning the potential meanings of "meditation" and "personal beliefs" will naturally arise in the minds of public school students.

### C.

In light of conclusions discussed above, a detailed examination of potential administrative entanglements under the third prong of the *Nyquist* test is not necessary here. Suffice it to say that the bill not only leaves school officials and teachers in the position of administering the law, but also leaves them to interpret its requirements. As they perform these tasks, "public funds, though small in amount, are being used to promote a religious exercise. Through the mechanism of the State, all of the people are being required to finance a religious exercise that only some of the people want and that violates the sensibilities of others." *Schempp, supra,* 374 U.S. at 229, 83 S.Ct. at 1575 (Douglas, J., concurring). Varying degrees of potential entanglement are as difficult to enumerate as are the potential effects, and appear to be no less problematical.

### III.

It cannot be denied, as the Supreme Court has explicitly recognized, "that religion has been closely identified with our history and government," *Schempp, supra,* 374 U.S. at 213, 83 S.Ct. at 1566, that indeed "[t]he history of man is inseparable from the history of religion," *Engel, supra,* 370 U.S. at 434, 82 S.Ct. at 1268, that the founders of our country "believed devotedly that there was a God and that the unalienable rights of man were rooted in Him," *Schempp, supra,* 374 U.S. at 213, 83 S.Ct. at 1566, and that an exceedingly large majority of people in this nation identify themselves as holding religious beliefs, *see id.,* 374 U.S. at 213, 83 S.Ct. at 1566. Religion has occupied, and continues to occupy, a prominent role in this society. As a corollary, and as no less an abiding principle, total religious freedom has held an exalted position in this country. The founders of our nation knew personally the dangers and the persecution that are set afoot when governments take a position either for or against religious beliefs, and they recognized very well that "freedom to worship was indispensable in a country whose people came from the four quarters of the earth and brought with them a diversity of religious opinion." *Schempp, supra,* 374 U.S. at 214, 83 S.Ct. at 1567. Bringing their convictions to bear, the framers of our Constitution were determined that every *individual* must be free to practice or not to practice religious beliefs in accordance with the dictates of his own conscience, and that *government* must stay out of religious affairs entirely. The issue here, then, concerns power—the power of the legislature—and it is clear that on both sides of the spectrum, the state lacks power either to handicap or to favor religions, *Everson, supra,* 330 U.S. at 18, 67 S.Ct. at 513. The absence of power under our Constitution to enact legislation respecting religion is complete, however popular a measure might be and whether it would *favor or oppose* a particular religion or all religions. Justice Rutledge, dissenting in the *Everson* case, forcefully stated this principle, as follows:

Our constitutional policy ... does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny that the state can undertake or sustain them in any form or degree. For this reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the twofold protection and, as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private.

*Everson, supra,* 330 U.S. at 52, 67 S.Ct. at 529.

Even if all of the tests and what might be viewed as technical requirements are to be set aside, the ultimate question in a case such as this nevertheless concerns whether the legislation at issue is neutral; whether it favors religion, or whether it opposes religion. If it is not neutral it must be struck down:

The wholesome "neutrality" of which [Supreme Court] cases speak ... stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert of dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits. And a further reason for neutrality is found in the Free Exercise Clause, which recognizes the value of religious training, teaching and observance, and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state. This the Free Exercise Clause guarantees.

*Schempp, supra,* 374 U.S. at 222, 83 S.Ct. at 1571. Under our Constitution, individuals can exercise their religious beliefs or individuals can refuse to exercise religious beliefs, and they may do so as groups, but Congress and state legislatures must leave them alone. Individuals can promote their religious beliefs or individuals can oppose religious beliefs, and they may do so as groups, but Congress and state legislatures cannot. The statute before the court was not intended to be a neutral measure, and it cannot be viewed as such. It is therefore violative of the Establishment Clause.