Lyle A. DeSPAIN and Mary R. DeSpain, individually, and as parents and natural guardians of Laura I. DeSpain, a minor, and as taxpayers on Behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

DeKALB COUNTY COMMUNITY SCHOOL DISTRICT 428, a body politic, The Board of Education of DeKalb County Community School District 428, Marvin L. Berge, Esther Watne and George P. Riccio, Defendants.

No. 66 C 543.

United States District Court
N. D. Illinois, E. D.
June 27, 1966.

Ralph Jonas, Chicago, Ill., for plaintiffs.

Peter Fitzpatrick, Chicago, Ill., and John A. Leifheit, Leifheit & Cliffe, De-Kalb, Ill., for defendants.

Decision on Merits on Complaint
for Injunction

ROBSON, District Judge.

Plaintiffs seek an injunction against the alleged violation of their constitutional rights by virtue of the recital in the kindergarten class which their child, Laura I. DeSpain, attends, of the following verse, which they deem to be a prayer:

> "We thank you for the flowers so sweet;
> We thank you for the food we eat;
> We thank you for the birds that sing;
> We thank you for everything."

The complaint states that defendant Marvin L. Berge is superintendent of schools of DeKalb County Community School District 428; that George P. Riccio is the principal of the Ellwood Public School in DeKalb County Community School District 428, and that Esther Watne is the kindergarten teacher in that school who instructs the child. The complaint further alleges that from the commencement of the 1965–1966 school year until the present date Mrs. Watne has conducted the "prayer" and has required all of her students, including Laura, to fold their hands in their laps,

close their eyes and assume a traditional devotional and prayerful attitude immediately prior to its recitation.

It is also alleged that the parents do not believe in the existence of a divine being who hears or responds to prayers or supplications, and that the recitation of the daily prayer constitutes the establishment of a religious practice and inhibits and restricts the free exercise of plaintiffs' religious beliefs and practices. Despite repeated protests by plaintiffs, defendants have failed and refused to stop or prohibit the recitation of the prayer, and unless restrained, will continue to do so, thereby violating plaintiffs' constitutional rights under the First Amendment.

Count II reiterates the foregoing allegations and charges their rights under the Illinois Constitution, Article II § 3, S.H.A., are violated. Plaintiffs are thereby required to support a place of worship without their consent. Count III, in addition to the above allegations, states that plaintiff parents are taxpayers of the State of Illinois, and that a portion of federal taxes is allocated to the School, as well as the state taxes, which action is in derogation of plaintiffs' rights and privileges under the First Amendment to the Federal Constitution and the Illinois Constitution.

The court has heretofore denied the prayer for relief by preliminary injunction. A full hearing has now been had on the merits.

The controversy resolves down to the narrow issue whether the verse above-quoted is to be considered a prayer and if so whether its recital is proscribed by constitutional prohibitions as interpreted by the many decisions.

Preliminarily, it might be said that it is regrettable that this problem could not have been amicably solved by conference between the parties without the interjection of a lawsuit and subjecting small children, the school, and the community to the disturbing influence of litigation. While few things can be considered more important than constitutional rights, infinitesimal invasions which could be rectified by minor adjustment of phraseology, such as the substitution of the word "grateful" for "thank you" in the verse would instill in the child appreciation for the world around him and foreclose all imputation of a prayer. However, in view of plaintiffs' attitude it is doubtful if this would have satisfied them.

It is the defendants' earnest position that this verse is but one of many routinely recited throughout the day aimed to instill in the child his place in society and the community and to inculcate good manners, graciousness, and gratefulness into his character. The many exhibits indicate that through verse, the child is taught to realize his dependence upon tradespeople who serve him: the milkman, the mailman, the plumber, and similar occupations. Further, he is taught to observe natural phenomena, such as rocks, the sun, bird migration, flowers, birds, and other subjects about him. His attention is called to weather conditions: rain, fog, snow, etc. He is taught politeness: to say thanks, pardon me, etc. The secular kindergarten curriculum stresses the saying of thanks. The child is instructed in "finger exercises," which explains, defendants insist, the putting of the child's hands in his lap prior to taking milk and crackers. The gesture is made for the practical purpose of preventing one child partaking of his food before another does so and from spilling the milk or dropping the crackers.

The court concludes that the verse, recited in the setting proved by the testimony in this case, is not a prayer or religious activity within the meaning of the Constitution, and that the instant complaint must be dismissed for failing to state a cause of action. The conclusion is based on these considerations:

1. The teacher used the verse with the prime objective of making the child aware of the beauties of the world around him and grateful for them. The "purpose and primary objective" of the verse was not religious.

2. The aim of inculcating good manners in the children, the mode of proper serving of a meal, and awaiting eating until all were served, and thanking donors of special treats, were paramount in the teacher's purposes.

3. No complaint was made by plaintiffs to the school authorities that the children closed the verse by saying "Amen," by crossing themselves, or that they bowed their heads, all of which leads to the inference that no such acts took place. That conclusion is fortified by testimony of disinterested witnesses, as well as defendants. It is probable that any such acts which may have occurred, and which escaped the teacher's attention, were due to the children's own ideas, or their extracurricular training.

4. The very widespread use of this verse in kindergarten curricula outside of DeKalb is indicative that its use was thought by many to be secular rather than religious.

5. Substantial latitude must be afforded a teacher in her choice of mode of instruction and a court should exercise great care not to proscribe educational freedom.

6. Plaintiffs' complaint states they believe in no form of supplication to a divine being. The court does not believe that the instant verse offends that right, in that it simply expresses gratitude.

The evidence is in complete contradiction as to whether the children took a "devotional attitude" in reciting the prayer. The plaintiffs testified that some of the children said "Amen" at the conclusion of the verse, and some crossed themselves. The defendants, and presumably impartial witnesses called by them—parents of other children—testified that they saw *no* instance of such action at anytime. Plaintiffs testified the children's heads were bowed; defendants' proof was that the children looked around at each other, at the teacher, or at the food.

The court, therefore, considers the character of the recital without regard to that aspect of the allegations, they not having been convincingly proved. If it were indispensable that a conclusion be drawn on that factor, the court would be inclined to believe that any such action on the part of the child was due to habits formed outside the class, which totally escaped Mrs. Watne's observation, and were certainly beyond her instruction and not the result of any intent on her part. The court is not convinced that such devotional acts actually occurred.

*Summary of the Evidence*

Father A. Donald Davies, an Episcopal priest, a Professor of Christian Education and Director of the Master of Arts program in Christian Education, employed at the Seabury-Western Theological Seminary, testified directly that the verse with the word "God" in the last line is a prayer, and part of the religious education of Episcopal children. He also stated that the verse recited in the instant complaint is a prayer, and the deletion of the word "God" did not change his opinion that it was a prayer. He felt that even with the word deleted the "intent is to offer thanks to God." He stated the purpose of the prayer is "to guide the children in their understanding of God as a creator, and with an expression or response upon their part in the offering of thanks, in a communication to the deity or to God, and as such I would have to wonder who the 'you' is."

However, in answer to a question on cross-examination that on the assumption there is no God, whether it would be useful for a five-year old child to recite the poem in order to get a feeling of integration in his physical environment, he stated that "it is possible that it might be meaningful." In answer to the court's interrogation as to whether the verse, completely isolated, was a prayer, Fr. Davies said: "Completely isolated, I would have to say that it would not be." Nor would it be where it followed the thanking of persons who had made special donations of cakes.

This interrogation occurred in his testimony:

"The court: So taken as an isolated statement, in and of itself, it is not a prayer? Is that your conclusion?

"A. Right, isolated."

Dr. John E. Burkhart, affiliated with the United Presbyterian Church, who is on the faculty of the McCormick Theological Seminary, and Curriculum Consultant for the Presbyterian Board of Christian Education, testified for the plaintiffs. He defined "prayer" thus: "Prayer is that religious activity and/or attitude in which divine powers are addressed explicitly or implicitly, publicly or privately." As to the verse here in question, he stated: "This clearly is a prayer, both in form and intention. * * * The 'you' which is the functional word in this prayer would be obviously addressed to someone who is thought to provide everything." He thought it a rather poor adaptation of the verse which first appeared in print in "A Child's Book of Prayers" in 1941 under the name of Mrs. Latham. Many children learn it in Sunday School and "[I]t is, therefore obviously in connotation and usage a religious act. He also said:

"It does not stop being a prayer when the word 'God' is removed, since the children who use it as a prayer * * * use it and understand it as a prayer. So, in common context it is a prayer which has simply been modified, but has not lost its prayer connotation or meaning."

On cross-examination, another book which had the same verse, copyrighted in 1935, the Silver Book of Songs by a Mrs. Perkins, was the subject of interrogation. The title page stated it was compiled by *public school administrators* and teachers of music.

Dr. Burkhart further testified:

" * * * I understand that one is properly grateful only to God for everything, if one is a believer. And if one is not a believer, such a statement is both meaningless and offensive if it is forced on one."

* * * * * *

"It is not clear to me that something becomes a prayer by the use of the word 'God' or is not a prayer if 'God' is not mentioned."

Dr. Burkhart answered affirmatively when he was asked by the court whether he deemed the verse a prayer when it was isolated completely and considering it objectively in the form that it presently is in even if he did not know the source from which it came.

Mr. DeSpain, the child's father, testified that when he first visited his son's kindergarten class in the fall of 1964 he heard the children, led by Mrs. Watne, recite "We thank thee Lord for this good food. Amen."

Roger DeSpain, age seven, who had been in the kindergarten the previous year demonstrated in court the children's posture during the saying of the verse and indicated he placed his folded hands near his stomach, bowed his head, eyes closed, and he stated that the children said "Amen" at the close of the verse. Laura DeSpain, who had just turned six, also testified that the children said "Amen" at the close of the verse and sat with their fingers intertwined on their laps and their eyes closed during its recital. Her head, however, was upright. She said they were told to fold their hands "but *we* thought of the idea of closing our eyes." She testified affirmatively that Mrs. Watne did *not* tell them to close their eyes. They were told *many times* during the day to fold their hands in their laps. There were many verses recited during the day when they put their hands in their laps.

Mrs. Watne testified at length as to her curriculum and activities in the conduct of her class. As to the meal time, she stated:

"The little hosts and hostesses serve their table. They have to count the children at the table, and then they go back and serve the napkins and then they pass the straws. And, of course, I try to have them go to the left side * * * for social manners.

"And then they pass the box of straws, and a little plate of graham crackers, or salty crackers, whatever we happen to have that day.

"And then the little hosts and hostesses put the milk on the table. In the meantime, I am going around saying, 'Now be sure that our hands are in our laps.' If the hands are not in the laps then all the straws and the napkins and the crackers are out on the floor. And it is not only saving me from wasting crackers and napkins and so forth, and time, but it is teaching the child social manners.

"And when all the children in all of the room are served, then I say" the verse.

She stated that the purpose of including the poem at that particular time "is for appreciation, gratitude, for the whole world that is in front of them."

She pointed out that the small child has just emerged from the circle of his home and now encounters the world, the twenty-nine other pupils, and the various teachers and the nurse, who are their "helpers," as are the helpers who come to their home, like the TV repairman, the plumber, and the milkman.

She further testifed *no* child crossed himself in 1964 or 1965 in her room. The grace of "We thank thee Lord for this good food. Amen," was *not* said in her classroom in 1964. She testified to the deletion of the word "God" from the verse presently censured, after Mr. and Mrs. DeSpain complained to the school Board and the superintendent of schools and the principal. She testified that the purpose of the recital is to teach the children to be thankful and grateful for what they receive and is a part of her "thankfulness program." She went on to say:

"I don't ever discuss any form of religion at all in my classroom."

She further said:

"It is good citizenship for everybody to wait until everyone is served in the room, and then we start to eat."

Several parents testified as to their observations on visiting Mrs. Watne's class. Mrs. Schrowenger visited in February, 1966, and testified she did *not* notice the children looking anywhere special when the verse was said; that their eyes were open; that she saw *no* one cross himself and recalled hearing no one say "Amen."

Mrs. Randall testified that at the time of the verse she could not see the children's hands but the attitude of their heads was that they "just sat there looking around or nudging. * * *" Their heads were *not* bowed. She saw *no* child cross himself nor say "Amen."

Mrs. Carr testified the children had their hands in their laps and the children "were either looking around the room or at Mrs. Watne." Their heads were at no time bowed; no child crossed himself, nor said "Amen." She said the children were looking at the food and were excited about it.

Mrs. Forster testified she had been to the class five times. She testified that during the recital of the verse some of the children were looking at the teacher, some at her, some glancing sideways at their neighbor's plate to see who had the largest cookie or something like that. She saw nothing that might be interpreted as a requirement by Mrs. Watne that the children close their eyes or assume a devotional attitude; that there was no difference in the way the children said this verse from any other; that she heard no child say "Amen."

Defendant Marvin L. Berge, the superintendent of schools of DeKalb County Community School District 428, had occupied that position for ten years. He had been a curriculum director of Elgin, Illinois schools. He had read very thoroughly the Report of the Commission on Religion in the public schools of the American Association of School Administrators, a special committee appointed to study this particular problem and he followed it as a guide. He testified that "I suspect I have * * * heard that poem recited hundreds of times in my experience, and *I have never felt*

*that it had any religious connotation to it."*

Mr. Berge further testified that on neither occasion when the DeSpains visited him did they make complaint that in Mrs. Watne's room children were crossing themselves. He also felt that it would *not* be proper for "a plain, ordinary non-denominational prayer [to be said] * * * without comment, in the public school by a teacher and the children * * * instructed to recite it." When the court asked whether the verse is generally used in the public schools in connection with an occasion such as the serving of milk and crackers, he answered, "It is used very extensively in kindergartens," throughout the school systems with which he had been associated. He had first heard the verse back in about 1923.

Defendant George P. Riccio, principal of the Ellwood Public School, testified to Mrs. DeSpain's objection to the recital of the verse, but there was no complaint made about the children crossing themselves or assuming a devotional attitude. He further testified as to his observation of the children and stated, "They were seated at a table and they were having a conversation and visiting with one another. Their hands were in their laps." He said the position of their heads was up, that he never saw anyone take a devotional attitude and saw no one cross himself.

Mrs. Eychaner, a member of the Board of Education, testified as to the plaintiffs' appearance before the Board and that they made no complaint of any child making the sign of the cross. She further testified that the Board "believed we were operating within the law and obeying the Supreme Court decision and that this was within the teacher's right to conduct her classroom according to her curricular standards" as long as she obeyed the Supreme Court.

Mr. Montavon, a farmer, president of the Board, stated his testimony would be the same as Mrs. Eychaner.

Dr. Edra Lipscomb, who holds a certificate in primary kindergarten work, a professor in the Educational Department at Northern Illinois University, testified that verses of the kind alleged in the complaint are commonly used, and the teachers had not considered it a prayer exercise. At a kindergarten workshop she had inquired of forty kindergarten teachers how many used verses such as this and they all said they did. The thank you verse, she testified, "would certainly fit part of this philosophy of helping the children not [only] prepare themselves for life but actually become a part of the living society." On cross-examination she testified that kindergarten teachers were instructed by the Superintendent of the Lab School of Northern Illinois University not to require the children to use a verse very similar to this verse.

### The Law

The Supreme Court opinions have with exhaustive thoroughness researched the historical background of the Constitutional Amendments here involved. No discussion by this court could enhance the subject. The First Amendment to the Constitution provides:

"Congress shall make no *law* respecting an establishment of religion, or prohibiting the free exercise thereof * * *." (Emphasis added.)

The Fourteenth Amendment provides:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State [shall make or enforce any *law* which] shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.)

It is notable that both constitutional provisions contemplate the proscription of *laws* in respect to religion. There has been no law by a governmental body requiring the use of this verse. There has

not even been a regulation by an educational board, or superintendent, authorizing its use. The closest it comes to official action is the omission of a board, superintendent or principal to bar the use of the verse upon it being brought to their attention. Its use could be eliminated in a day—which might be commendable—or it could be once more revised, as it has heretofore been. Its use has none of the rigidity of a promulgation by statute or regulation, and therefore no hazard of assured continuance.

Thus in the opinion of the Supreme Court in School District of Abington Tp., Pa., v. Schempp, 374 U.S. 203, at 220, 83 S.Ct. 1560, 1570, 10 L.Ed.2d 844, the court quotes from an earlier opinion:

"'[N]either a state nor the Federal Government * * * can constitutionally pass *laws* or impose *requirements* which aid all religions. * *'" (Emphasis added.)

On page 222, 83 S.Ct. on page 1571 of the same case, it is said:

"* * * [I]t has consistently held that the clause [First Amendment] withdrew all *legislative* power respecting religious belief or the expression thereof. The test may be stated as follows: what are *the purpose and the primary effect of the enactment?* If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular *legislative* purpose and a primary effect that neither advances nor inhibits religion. * * * The Free Exercise Clause, likewise considered many times here, withdraws from *legislative* power, state and federal, the exertion of any restraint on the free exercise of religion." (Emphasis added.)

In the *Schempp* case, supra, the state *law* required that at least ten verses from the Holy Bible be read, without comment, at the opening of each school day, but any child could be excused upon written request from the parent. The Lord's Prayer was also recited. In the companion case decided in the *Schempp* case, supra, the Board of School Commissioners of Baltimore City adopted a *rule* providing for the holding of opening exercises consisting primarily of the reading, without comment, from the Bible and/or the use of the Lord's Prayer. The court quoted from a prior opinion, at 216, 83 S.Ct. at 1568:

"* * * [T]he effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense. * * *"

It is said, at 218, 83 S.Ct. at 1569:

"* * * [P]ublic schools are organized 'on the premise that secular education can be isolated from all religious teaching so that the school can inculcate all needed temporal knowledge and also maintain a strict and lofty neutrality as to religion.'"

It is further stated, at 219, 83 S.Ct. at 1570:

"* * * [T]he Constitution * * * prohibited the Government common to all from becoming embroiled, however innocently, in the destructive religious conflicts * * *."

In the *Schempp* case, supra, it was said, at 220, 83 S.Ct. at 1570:

"* * * [N]either a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can *constitutionally pass laws or impose requirements* which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs. * * *" (Emphasis added.)

It is said, at 224, 83 S.Ct. at 1572:

"The conclusion follows that in both cases the *laws require* religious exercises and such exercises are being con-

ducted in direct violation of [constitutional] rights * * *.

" * * * [I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent * * *." (Emphasis added.)

Justice Brennan in his concurring opinion states, at 230, 83 S.Ct. at 1576:

" * * * It is therefore understandable that the constitutional prohibitions encounter their severest test when they are sought to be applied in the school classroom."

He further stated, at 231–232, 301, 83 S.Ct. at 1576:

" * * * [T]he line which separates the secular from the sectarian in American life is elusive. * * * "

* * * * * *

" * * * *While it is my view that not every involvement of religion in public life is unconstitutional,* I consider the exercises at bar a form of involvement which clearly violates the Establishment Clause."

* * * * * *

"We do not, however, in my view usurp the jurisdiction of school administrators by holding as we do today that morning devotional exercises in any form are constitutionally invalid." (Emphasis added.)

The court appreciates the danger inherent in seemingly innocuous practices. Thus the Supreme Court in Engel v. Vitale, 370 U.S. 421, at 436, 82 S.Ct. 1261, at 1270, 8 L.Ed.2d 601 (1962), quoted from James Madison, the author of the First Amendment, that " '[I]t is proper to take alarm at the first experiment on our liberties.' "

In Chamberlin v. Dade County Board of Public Instruction, 377 U.S. 402, 84 S.Ct. 1272, 12 L.Ed.2d 407 (1964), the Supreme Court in a per curiam opinion held that devotional Bible reading, which was required by *statute* in the Florida public schools, was unconstitutional,

basing its decision on the *Schempp* case, supra.

In Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), it was held that because of the prohibition of the First Amendment against the enactment of any *law* "respecting an establishment of religion," which is made applicable to the States by the Fourteenth Amendment, state officials may not compose an *official* state prayer and *require* that it be recited in the public schools of the State at the beginning of each school day— even if the prayer is denominationally neutral and pupils who wish to do so may remain silent or be excused from the room while the prayer is being recited. In that case, the Board of Education, *acting in its official capacity under state law, directed* the school district's principal to cause the prayer to be said aloud by each class in the presence of the teacher at the beginning of each school day. The prayer was:

"Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country."

The court cited the fact that the procedure was adopted on the recommendation of the State Board of Regents, a governmental agency created by the State Constitution to which the New York legislature has granted broad supervisory, executive, and *legislative* powers over the state's public school system. The officials composed the prayer which they recommended and published as a part of their "Statement on Moral and Spiritual Training in the Schools." The parents there complaining challenged the constitutionality of both the state law authorizing the School District to direct the use of prayer in public schools and the School District's regulation ordering the recitation of this particular prayer.

The Supreme Court there said, at 424–425, 82 S.Ct. at 1264.

" * * * There can, of course, be no doubt that New York's program of daily classroom invocation of God's blessings as prescribed in the Regents'

prayer is a religious activity. It is a solemn avowal of divine faith and *supplication* for the blessings of the Almighty." (Emphasis added.)

\* \* \* \* \* \*

" \* \* \* [T]he constitutional prohibition against *laws* respecting an establishment of religion must at least mean that in this country it is no part of the business of government to compose *official prayers* for any group of the American people to recite as a part of a religious program carried on by government." (Emphasis added.)

It further said, at 430, 82 S.Ct. at 1266:

" \* \* \* Under that Amendment's prohibition against governmental establishment of religion, as reinforced by the provisions of the Fourteenth Amendment, government in this country, be it state or federal, *is without power to prescribe by law* any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity.

"There can be no doubt that New York's state prayer program *officially* establishes the religious beliefs embodied in the Regents' prayer. \* \* \* The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and *is violated by the enactment of laws* which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." (Emphasis added.)

It stated at, 431–432, 82 S.Ct. at 1267:

" \* \* \* The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal \* \* \* to permit its 'unhallowed perversion' by a civil magistrate."

It stated at 433, 435, 82 S.Ct. at 1265:

" \* \* \* The New York laws officially prescribing the Regents' prayer are inconsistent both with the purposes of the Establishment Clause and with the Establishment Clause itself."

\* \* \* \* \* \*

" \* \* \* It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance."

The People of State of Ill. ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), case held that the utilization of the State's tax-supported public school system and its machinery for compulsory public school attendance to enable sectarian groups to give religious instruction to public school pupils in public school buildings violates the First Amendment of the Constitution, made applicable to the states by the Fourteenth Amendment. In that case, with the permission of a Board of Education, granted under its general supervisory powers over the use of the buildings, religious teachers, employed subject to the approval and supervision of the superintendent of schools by a private religious group including representatives of the Catholic, Protestant and Jewish faiths, gave religious instruction. Pupils whose parents so requested were excused from their secular classes during the periods of religious instruction and were required to attend the religious classes; but other pupils were not released from their public school duties, which were compulsory under state law. In that case, it was an admitted fact that the challenged program of religious instruction was not expressly authorized by statute.

The court said, at 210, 212, 68 S.Ct. at 465:

"No tax in any amount, large or small, can be levied to support any religious activities \* \* \* whatever form they may adopt to teach or practice religion."

\* \* \* \* \* \*

"Here not only are the state's tax-supported public school buildings used

for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory public school machinery. This is not separation of Church and State."

The Second Circuit case, Stein v. Oshinsky, 348 F.2d 999 (1965), was an action by parents to *enjoin school officials from preventing the recitation* of prayers on the children's initiative. The District Court had granted summary judgment to the parents, which judgment was reversed on the ground that the constitutional rights to free exercise of religion and to freedom of speech do not require a state to permit "student-initiated" prayers in public schools. The poem there involved was similar to the one *formerly* used by Mrs. Watne, including the reference to God. The court called it "the simple and ancient prayer." The principal ordered it stopped being said in kindergarten. The court said, at 1001:

"We likewise cannot sustain defendants' contention that the complaint did not sufficiently raise a claim of denial of constitutional rights to the free exercise of religion and to freedom of speech * * *."

\* \* \* \* \* \*

"[W]e shall assume, *arguendo*, in plaintiffs' favor that the Establishment Clause would *not* prohibit New York from permitting in its public schools prayers such as those here at issue. Nevertheless New York is not bound to allow them unless the Free Exercise Clause or the guarantee of freedom of speech of the First Amendment compels.

"Neither provision requires a state to permit persons to engage in public prayer in state-owned facilities whereever and whenever they desire." (Emphasis added.)

The court pointed out, at 1002:

"*Determination of what is to go on in public schools is primarily for the school authorities.* * * * The au-

thorities acted well within their powers in concluding that plaintiffs must content themselves with having their children say these prayers before nine or after three; their action presented no such inexorable conflict with deeply held religious belief * * *. After all that the states have been told about keeping the 'wall between church and state * * * high and impregnable,' * * * it would be rather bitter irony to chastise New York for having built the wall too tall and too strong." (Emphasis added.)

The court concludes that this is a case *de minimis*. Despite the theologians' characterization of this verse as a prayer, the court believes that set in the framework of the whole school day, its purpose was not to pray but to instill in the children an appreciation of and gratefulness for the world about them—the birds, the flowers, the food, and everything. They asked no blessing; they sought no divine assistance.

The teacher was exercising her pedagogical function of making the pupils socially acceptable persons, as well-mannered guests, grateful in their appreciation of their provider. She sought to make all wait until the last was served before they began eating, and then to pause before eating to impress upon them the wonders of the world about them, including food. The verse might be compared to those found in "A Child's Garden of Verses" by Robert Louis Stevenson, entitled, "A Thought":

"It is very nice to think
The world is full of meat and drink,
With little children saying grace
In every Christian kind of place,"

or the couplet, "Happy Thought":

"The world is so full of a number of things

I'm sure we should all be as happy as kings."

A multitude of other poems of similar purport by noted poets could be cited.

The court believes that this case presents the situation characterized by Justice Goldberg in the *Schempp* case, su-

pra, 374 U.S. at 308, 83 S.Ct. at 1616, thus:

> "It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and *mere shadow*." (Emphasis added.)

The instant verse seems precisely that: a mere shadow rather than a real threat.

This is not a case, such as the many precedent outlined above, of *legislative or regulatory fiat* that defined religious activity to be followed. Here was one teacher using a curriculum widely recognized in kindergartens. It was *her* choice to utilize the verse—no legislature, superintendent of schools, Board of Education or principal demanded its continued use. She felt it was in accord with all her other exercises in instilling social realization and graces in the children. Its religious connotation, if any, was completely incidental to implanting gratitude in the child for the things about them, irrespective of who placed them there.

The defendants showed amenability to respecting plaintiffs' religious beliefs and sought to solve the complaint by deleting the reference to "God" from the verse, thereby in their eyes nullifying any imputation of a prayer, but retaining all the secular aims sought to be achieved. The court would be very reluctant to substitute its views as to how the aims of this kindergarten teacher to implant graciousness and gratitude in very young children should be accomplished. That not only she, but many others, thought well of this verse is amply demonstrated in the evidence. Its broad use suggests it was felt to have value and merit, and was not considered a prayer in a religious sense.

The court is of the opinion that the facts of this case do not warrant its intervention under the guise of enforcement of constitutional rights into the educational program of this kindergarten curriculum. The so-called violation of the rights of plaintiffs is, if anything,

"a mere shadow" rather than "a real threat" and on this basis the court is asked to become the arbiter of a kindergarten curriculum. Our system of education has assumed world preeminence through scholastic independence. If the courts allow themselves to be injected into a dispute, such as this, scholastic independence would disappear and our educational processes become sterile. This was not the intent of the drafters of the First and Fourteenth Amendments to our Constitution.

In view of this conclusion, it is hereby ordered that the complaint be dismissed for failure to state a cause of action.