**Robert WARNER, Plaintiff,**

v.

**ORANGE COUNTY DEPARTMENT OF PROBATION, Defendant.**

**No. 93 Civ. 1544 (GLG).**

United States District Court, S.D. New York.

July 29, 1993.

---

Robert N. Isseks, Goshen, NY, for plaintiff.

Stephen R. Hunter, County Atty., Dept. of Law, Government Center Goshen, NY (Michael P. Bazell, Sr. Asst. County Atty., of counsel), for defendant.

## OPINION

GOETTEL, District Judge:

This is an action for compensatory damages and injunctive relief brought by Plaintiff Robert Warner against Defendant Orange County Department of Probation.

## I. STATEMENT OF THE FACTS

On November 13, 1990, Plaintiff was convicted of Driving While Ability Impaired under N.Y.Veh.Traf.Law Section 1192(1). This was Plaintiff's third alcohol-related driving offense within a period of slightly more than one year. Plaintiff received a sentence of three years probation which included several "conditions of probation." The subject of the present complaint is condition No. 5 which states: "That you will attend Alcoholics Anonymous at the direction of your probation officer." Plaintiff's Complaint at 3.

Alcoholics Anonymous (AA) is an organization dedicated to helping people recover from alcoholism. AA is not a party to this action. According to affidavits submitted by Defendant, there are over 35,000 AA programs in the United States and over one million members. Some important principles of the AA program are set forth in a pamphlet entitled "The Twelve Steps of Alcoholics Anonymous" which was allegedly distributed to Plaintiff and to many other new participants in AA. Several of these "steps" include language acknowledging the existence of a Higher Power and the necessity of subjugating oneself to such a Power as a precondition of successful treatment of alcoholism. Examples include:

> . . . .
>
> Made a decision to turn our will and our lives over to the care of God as we understood Him.
>
> . . . .
>
> Admitted to God, to ourselves and to another human being the exact nature of our wrongs.

Were entirely ready to have God remove all these defects of character.

. . . .

Sought through prayer and meditation to improve our conscious contact with God, *as we understood Him,* praying only for knowledge of His will for us and the power to carry that out.

Plaintiff's complaint at 4–5 (emphasis in original).

In addition to the "Twelve Steps", Plaintiff alleges, meetings frequently began with a prayer invoking the "Lord", and all members were encouraged to read a book written by the organization's founders, "The Big Book", which contains many references to spirituality and God. Chapter Four of "The Big Book", entitled "We Agnostics," provides:

To one who feels he is an atheist or agnostic such an experience seems impossible, but to continue as he is means disaster. . . . To be doomed to an alcoholic death or to live on a spiritual basis are not always easy alternatives to face. . . . About half our original fellowship were exactly of that type. At first some of us tried to avoid the issue, hoping against hope we were not true alcoholics. But after a while we had to face the fact that we must find a spiritual basis of life—or else.

Plaintiff's Complaint, Exhibit B at 1. Members are encouraged to consider their own conception of "God".

Plaintiff claims to be an atheist. He claims to have protested to his probation officers in 1990 when the sentence was imposed, as well as several times thereafter, that he found his forced participation in AA to be repugnant because it is religious in nature and because of its repeated emphasis on God and spirituality. Plaintiff does not object to alcohol rehabilitation programs per se as a condition of his probation, only to the specific make-up and character of AA. Defendant claims that, although Plaintiff complained about his requirement to attend AA meetings because he felt he did not need treatment, he did not articulate a protest on religious grounds until the summer of 1992.

Plaintiff brought suit in July 1992 in the local criminal court arguing that the condi-tion of his probation which required him to attend AA meetings violated his constitutional right to free exercise of religion.

On or about August 17, 1992, Plaintiff's probation officer provided him with names and telephone numbers of three alcohol abuse counselors who would be able to provide the treatment in lieu of the AA program without an emphasis on God or spirituality.

By order dated September 11, 1992, the criminal court dismissed Plaintiff's motion as moot.

Plaintiff now claims that his forced participation in AA as an element of his probation constituted a violation of the Establishment Clause of the U.S. Constitution. He requests injunctive relief and compensatory damages under 42 U.S.C. § 1983.

## II. DISCUSSION

### A. MOTION TO DISMISS

We can only grant a motion to dismiss where "it appears beyond doubt that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Branum v. Clark,* 927 F.2d 698 (2d Cir.1991) (when plaintiff alleges civil rights violations, courts should apply the rule of no dismissal unless beyond doubt that no set of facts can be proved in support of claims with particular strictness).

In reviewing a motion to dismiss, "the factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir.1988).

### B. MOOTNESS

■ Article III of the United States Constitution restricts the decision making power of the federal judiciary to cases involving "a case or controversy." Plaintiff must "demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions." *Los Angeles v. Lyons,*

461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Since Plaintiff has been provided with names and telephone numbers of alcohol abuse counselors acceptable to him, no controversy seems to remain with respect to the requested injunctive relief.

However, "[c]laims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable." *Stokes v. Wurtsboro,* 818 F.2d 4, 6 (2d Cir. 1987). It is difficult to see how Plaintiff could have sustained compensatory damages merely from being exposed to religious dogma. However, even if Plaintiff suffered no compensatory losses, he may be entitled to nominal damages of $1 and attorney's fees. *See, e.g., White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1056 (2d Cir.1993). In any event, Plaintiff has demanded compensatory damages, and we must proceed to the merits of his case.

## C. ESTOPPEL

 Defendant claims that this issue has been adjudicated in the local criminal court and therefore Plaintiff must appeal that decision if he is dissatisfied with it. Since he has not done so, Defendant asks us to find that Plaintiff is collaterally estopped from bringing this claim in federal court. We decline to do so. The local criminal court determined that:

> This court, under the facts presented, will not rule that the AA program as offered intrudes upon the defendant's rights or in any way requires him to practice religion under the 'threat' of imprisonment. Predicated upon the facts adduced, the Court finds that there are suitable other alternatives made available to the defendant as presented by the Orange County Department of Probation to attendance at AA that the defendant's current motion is rendered academic or moot.

*People v. Warner,* (Town of Woodbury Justice Court, September 11, 1992). As a criminal defendant, Plaintiff had brought an action for injunctive relief only. The local criminal court never adjudicated the issue of whether Plaintiff's rights were violated by the religious nature of AA, nor did the court address the question of damages. Therefore, Plaintiff cannot be collaterally estopped from litigating this issue before us by the proceedings of the local court.

## D. ESTABLISHMENT CLAUSE VIOLATION

Plaintiff claims to be an atheist and alleges that the spiritual nature of the AA program he attended as a condition of his probation deprived him of the rights guaranteed by the Establishment Clause of the First Amendment of the Constitution of the United States.

### 1. *Constitutional Standards*

The Supreme Court's treatment of the Establishment Clause has undergone substantial changes during the last half of this century, questioning practices that were common during the first 150 years following the passage of the First Amendment. We suspect that we have not seen the last of these changes. The Supreme Court once noted that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). The Court has further noted that:

> [t]he fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings.... This is not to say, however, that religion has been so identified with our history and government that religious freedom is not likewise as strongly imbedded in our public and private life.

*School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 213–14, 83 S.Ct. 1560, 1566–67, 10 L.Ed.2d 844 (1963). " 'Although Establishment Clause jurisprudence is characterized by few absolutes,' at a minimum 'the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith.' " *Zobrest v. Catalina Foothills School Dist.,* —— U.S. ——, ——, 113 S.Ct. 2462, 2473, 125 L.Ed.2d 1 (1993) (BLACKMUN, J. dissenting) (quoting *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 385, 105 S.Ct. 3216, 3223, 87 L.Ed.2d 267 (1985)). The First Amendment "did not simply bar a congressional enactment *establish-*

*ing a church;* it forbade all laws *respecting an establishment of religion.* Thus, this Court has given the Amendment a 'broad interpretation ... in the light of its history and the evils it was designed forever to suppress." *McGowan v. Maryland,* 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961) (quoting *Everson v. Board of Education,* 330 U.S. 1, 14–15, 67 S.Ct. 504, 510–11, 91 L.Ed. 711 (1947)). Government, therefore, "may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite." *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

Consistent with that belief, the Court "has unambiguously concluded that the individual freedom of conscience protected by the first Amendment embraces the right to select any religious faith or none at all." *Wallace v. Jaffree,* 472 U.S. 38, 53, 105 S.Ct. 2479, 2487–88, 86 L.Ed.2d 29 (1985). Under the Free Exercise Clause, "government may not compel affirmation of religious belief". *Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990).

The Court has further "rejected unequivocally the contention that the Establishment Clause forbids only governmental preference of one religion over another." *School Dist. of Abington Township,* 374 U.S. at 216, 83 S.Ct. at 1568; *See also, Lee v. Weisman,* — U.S. —, — – —, 112 S.Ct. 2649, 2668–2671, 120 L.Ed.2d 467 (1992) (SOUTER, J. concurring). Supreme Court jurisprudence clearly indicates that neither a State nor the Federal Government "can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." *School Dist. of Abington Township,* 374 U.S. at 220, 83 S.Ct. at 1570; *Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 1683–84, 6 L.Ed.2d 982 (1961).

■ On the basis of Supreme Court Establishment Clause jurisprudence, therefore,

we find that atheism falls within the protection of the First Amendment.

### 2. *State-imposed obligation to attend AA meetings*

■ Attendance at AA meetings was an explicit condition of Plaintiff's probation. According to the Order and Conditions of Probation signed by the criminal court which sentenced Plaintiff, failure to satisfactorily perform the conditions of probation could result in Plaintiff "being returned to the Court for further action, which may result in your possible confinement." Plaintiff's Complaint, Exhibit A at 1. While Plaintiff would not necessarily be incarcerated if he did not follow all of the conditions of probation, such action was reasonably within Plaintiff's contemplation while he was considering whether or not to attend the AA meetings. Plaintiff could have rejected the alcohol treatment for religious reasons, but only at the potential cost of incarceration.[1] Such a condition would seem to fit within the meaning of "obligatory" as interpreted by the United States Supreme Court.

The Supreme Court has held that attendance and participation at a secondary school graduation ceremony which included non-sectarian prayer is "in a fair and real sense obligatory, though the school district does not require attendance as a condition for the receipt of the diploma." *Lee,* — U.S. at —, 112 S.Ct. at 2655. The Court went on to hold that a "school official, the principal, decided that an invocation and a benediction should be given; this is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur." *Id.* If the Supreme Court deems such participation to be obligatory and imposed by the State, we cannot but find in this case that the government has "plac[ed] its official stamp of approval" on Plaintiff's participation in AA. *See Engel v. Vitale,* 370 U.S. 421, 429, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962).

### 3. *The Role of Lemon v. Kurtzman*

The underlying principle of the Establishment Clause has been clearly set forth by the

---

**1.** We note that there may be a problem even after alternative treatment programs are provided if

the alternative programs were provided at some higher financial cost to the probationer.

Supreme Court. "Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religion organizations or groups and vice versa." *Everson*, 330 U.S. at 16, 67 S.Ct. at 512. However, analyzing Establishment Clause violations has not proved simple. The Court recognized in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), that it "can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Id.* at 612, 91 S.Ct. at 2111. It then offered the clearest test laid down in recent years for analyzing these issues.

Essentially, the three criteria offered in *Lemon* are: 1) the policy must have a secular legislative purpose; 2) the principal or primary effect must be one that neither advances nor inhibits religion; and 3) the policy must not foster excessive government entanglement with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111. Since then, the *Lemon* test has been widely used by federal courts at all levels. *See Lamont v. Woods*, 948 F.2d 825, 841 (2d Cir.1991); *see also, Otero v. State Election Bd. of Oklahoma*, 975 F.2d 738, 740 (10th Cir.1992); *Chabad–Lubavitch of Georgia v. Miller*, 976 F.2d 1386, 1392 (11th Cir.1992). Writing in 1992, Justice Blackmun noted that "[s]ince 1971, the Court has decided 31 Establishment Clause cases. In only one instance, the decision of *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), has the Court not rested its decision on the basic principles described in Lemon." *Lee*, —— U.S. at —— n. 4, 112 S.Ct. at 2663 n. 4 (BLACKMUN, J. concurring).

AA has undoubtedly been the most successful organization in dealing with the problems of alcoholics. The policy of requiring probationers with drinking problems to attend AA does serve a secular purpose of preventing drunk driving. However, to the extent that AA is the selected organization, since it allegedly relies upon religious indoctrination to enforce its principles, it arguably has a primary effect of advancing religion. Since the state court has directed Plaintiff's participation, it could be viewed as excessive government entanglement with religion.

Plaintiff claims that the pervasive references to "God" and "spirituality" along with the psychological pressure to accept the AA beliefs, which he allegedly encountered in the AA literature and in the meetings he was compelled to attend, did, in fact, inhibit his religious beliefs (or, more accurately, absence of religious beliefs). At a minimum, the complaint adequately alleges a violation of the establishment clause.

However, we are wary of relying upon *Lemon v. Kurtzman*. Recent decisions, although neither directly overturning nor limiting the *Lemon* holding, seem to indicate that the Court does not intend to rely so heavily upon it. *See, e.g. Lee*, —— U.S. at ——, 112 S.Ct. at 2685 (SCALIA, J. dissenting) (noting that the Court found a state-sponsored religious exercise although essentially ignoring the *Lemon* criteria); *Zobrest*, —— U.S. at ——, 113 S.Ct. at —— (appellate court decision relying on *Lemon* overturned); *Southside Fair Housing Committee v. New York*, 928 F.2d 1336, 1344–47 (2d Cir.1991) (applying *Lemon* test but expressing doubts as to whether it would continue to be applicable following *Lee v. Weisman*, then pending in the Supreme Court).

### 4. Religious nature of AA meetings

We must, therefore, analyze the present case without undue reliance on the *Lemon* criteria. "There is no doubt that attempts to aid religion through government coercion jeopardize freedom of conscience. Even subtle pressure diminishes the right of each individual to choose voluntarily what to believe." *Lee*, —— U.S. at ——, 112 S.Ct. at 2665. Plaintiff has complained of the pervasive spiritual element in AA meetings and literature. Defendant suggests that the spiritual element in AA is "flexible" and should not be problematic. This is not the law. That "the intrusion was in the course of promulgating religion that sought to be civic or nonsectarian rather than pertaining to one sect does not lessen the offense or isolation to the objectors." *Id.* —— U.S. at ——, 112 S.Ct. at 2659.

Defendant has noted that the pamphlet containing the "Twelve Steps" refers, in places, to "God *as you understand him* " in an apparent attempt to remove references to

any particular religion or, perhaps, to religion itself. An appendix to "The Big Book" notes that, although "it was not our intention to create such an impression, many alcoholics have nevertheless concluded that in order to recover they must acquire an immediate and overwhelming 'God-consciousness'" but that "such transformations, though frequent, are by no means the rule.". Defendant's Motion to Dismiss, Exhibit D at 3. The question here, however, is not the good faith of Defendant or AA in attempting to make the spiritual element acceptable to most persons, but the legitimacy of their requiring attendance in a treatment program which, Plaintiff alleges, emphasizes prayer and spirituality. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2656. General acceptance of the spiritual element by members of AA does not affect our decision.

> [I]n the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce. A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.

*Id.* —— U.S. at ——, 112 S.Ct. at 2658.

The case upon which Defendant relies for the proposition that AA is not a religious organization, *Stafford v. Harrison,* 766 F.Supp. 1014 (D.Kan.1991), draws its legal justification from a misapplication of Justice Douglas' concurring opinion in *U.S. v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). *Stafford* finds that "the belief in a Supreme Being 'cannot be sustained as a distinguishing characteristic of religion.'" *Stafford,* 766 F.Supp. at 1017. The passage from *Seeger* cited by the *Stafford* court stands not for the proposition that reference to a Supreme Being does not make something a 'religion', but for the proposition that belief in a Supreme Being is not a prerequisite for a religion. In fact, Douglas specifically notes Hinduism and Buddhism as religions which do not include a concept of a Supreme Being. As a result, we base our analysis upon decisions of the Supreme Court rather than upon *Stafford.*

At oral argument, we were told by Defendant that each chapter of AA is operated independently and that some do not rely heavily on religious practices. If this is indeed true, the direct holding in this case may apply only to the specific chapter attended by Plaintiff and not to AA as a national organization. Consequently, this gives us an added reason to rely heavily on the specific facts of this case in resolving this issue, something that will be impossible if the action does not proceed to trial or at least a summary judgment motion.

Examining Plaintiff's allegations, we cannot hold as a matter of law that the chapter of AA whose meetings Plaintiff was compelled to attend does not have an objectional religious component.

### 5. *Vulnerability of Plaintiff*

Even if the court determines that Plaintiff was compelled to attend meetings at the chapter of AA and that such meetings were religious in nature, it does not necessarily follow that Plaintiff experienced a violation of his rights under the First Amendment. In *Lee,* the Supreme Court limited its decision that coerced exposure to a non-sectarian benediction violated the Establishment Clause to a situation where school-children were affected. "We do not address whether that choice is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position." *Lee,* —— U.S. at ——–——, 112 S.Ct. at 2658–59. Pointing both to case law and psychological studies, the Court noted the susceptibility of adolescents to pressure from their peers toward conformity and the importance of protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools. *Id.*

Because "Establishment Clause jurisprudence remains a delicate and fact-sensitive one", *Lee,* —— U.S. at ——, 112 S.Ct. at 2661, we cannot hold as a matter of law that Plaintiff, a recovering alcoholic facing the threat of incarceration, is significantly less susceptible to the coercive pressure he alleges occurred in the AA meetings than were the secondary school students to the coercive pressure they

experienced during the prayers offered at their graduation ceremony. We note that, as alleged by Plaintiff, the pressure exerted by AA to accept a form of spirituality seemed considerably more forceful than that exerted upon the school-children, for example where AA literature informs Plaintiff that he "must find a spiritual basis of life—or else." Plaintiff's Complaint, Exhibit E at 1.

In *Marsh v. Chambers, supra,* the Court held that the policy in the Nebraska legislature of beginning each of its sessions with a prayer by a Chaplain paid by State funds did not violate the Establishment Clause. The Court recently distinguished that case as pertaining specifically to the "atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons". *Lee,* —— U.S. at ——, 112 S.Ct. at 2660. In *Marsh,* the Court noted that "the individual claiming injury by the practice is an adult, presumably not readily susceptible to 'religious indoctrination,' " *Marsh,* 463 U.S. at 792, 103 S.Ct. at 3336. We cannot apply the same reasoning in this case because, unlike the complaining parties in *Marsh,* Plaintiff was *not* allowed to come and go as he pleased but was required to attend the activity where the alleged violation occurred. Nor are we certain that Plaintiff, as a recovering alcoholic, was not significantly more susceptible to religious indoctrination than the "adults" referred to in *Marsh.* We call attention to *Torcaso v. Watkins,* where the court struck down a provision of the Maryland Constitution requiring public officials to declare a 'belief in the existence of God.' *See Torcaso,* 367 U.S. at 489, 81 S.Ct. at 1680–81. We would hope that the Court did not so hold because of a fear of the susceptibility of public officials to religious indoctrination. Where the party's presence and participation in the alleged religious conduct are mandatory, *Marsh's* reasoning carries less force.

For these reasons we cannot grant Defendant's motion to dismiss.[2]

## E. VALIDITY OF PRISON POLICIES

As a final matter, Defendant argues that requiring Plaintiff to attend AA is a prison policy and should therefore be presumptively valid. Although Plaintiff was not in prison when he was ordered to attend AA meetings, the violation of the condition of his probation might have resulted in his being imprisoned, leading us to consider this condition on par with prison policies for the purposes of legal inquiry. The Supreme Court has held that where a challenged prison policy impinges on an inmate's constitutional rights, the policy is valid if it is reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987). Factors relevant to this analysis of reasonableness include: 1) whether there is a logical connection to the governmental interest invoked to justify it; 2) whether alternative means of exercising the constitutional right remain open to inmates; 3) the impact of accommodating the constitutional right on staff and other inmates and the allocation of prison resources; and 4) whether the policy represents an exaggerated response to institutional concerns. *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987).

Applying these factors to the present case, it seems apparent there is a logical connection to the governmental interest of preventing drunk driving. As noted earlier, AA is widely used in penal systems across the United States and has an admirable record of success in treating people with alcohol problems. *See, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Williams v. Ward,* 556 F.2d 1143, 1146 (2d Cir.1977). However, as our previous discussion indicates, Plaintiff's means of exercising his First Amendment rights in the face of such a policy are not at all clear. *See, e.g., Lee,* —— U.S. at ——, 112 S.Ct. at 2665. Furthermore, the ease with which Defendant acquiesced to Plaintiff's request for alternate treatment together with the rarity of such

2. We note, however, that Alcoholics Anonymous is not a party. It may be necessary for Plaintiffs to join the organization as a defendant to this

action in order to properly examine the factual issues raised by the case.

requests suggest to us that the impact on the County penal system of accommodating Plaintiff's right would not be significant.

We find that, based on Plaintiff's factual allegations, the specific application of this policy to Plaintiff overcomes the presumptive validity of prison policies, if this be considered one.

## III. CONCLUSION

For the foregoing reasons, we hold that Plaintiff has stated a claim under 42 U.S.C. § 1983 and is not estopped from bringing this case in our court. We therefore deny Defendant's motion to dismiss.

SO ORDERED.