Robert WARNER, Plaintiff,

v.

**ORANGE COUNTY DEPARTMENT OF PROBATION, Defendant.**

**No. 93 Civ. 1544(GLG).**

United States District Court, S.D. New York.

June 27, 1997.

Robert N. Isseks, Goshen, NY, for Plaintiff.

Richard B. Golden, County Attorney, Goshen, NY (Kevin Coffey, of counsel), for Defendant.

## MEMORANDUM DECISION

GOETTEL, District Judge.

This matter is before this Court in an unusual posture. The events involved in this case occurred between 1990 and 1992. The action was commenced in 1993. It was tried in 1994 with a verdict for the plaintiff. *Warner v. Orange County Department of Probation,* 870 F.Supp. 69 (S.D.N.Y.1994). Defendant then appealed. On September 9, 1996 the Court of Appeals affirmed with a dissent. *Warner v. Orange County Dept. of Probation,* 95 F.3d 202 (2d Cir.1996). The defendant then moved for rehearing, suggesting that the rehearing be held *en banc.* On May 14, 1997, the Second Circuit Court of Appeals amended the original majority decision, *Warner v. Orange County Dept. of Probation,* 115 F.3d 1068 (2d Cir.1997), but on the same date also issued a remand order. *Warner,* 115 F.3d.1068 (2d Cir.1997). The Court of Appeals Clerk's Office advises that both the original opinion and its amendment have been vacated by the order of remand so that no opinions remain outstanding.[1]

---

1. We do not profess to understand why an    amended opinion should be filed on the same

The remand order notes that, in connection with the petition for rehearing, "judges of this Court have expressed an interest in whether Warner, by failing to appeal his sentence, waived or forfeited the right to seek damages under § 1983, and in whether the County raised the issue at trial." The remand then directs the District Court to consider two questions: (1) whether the County asserted at trial that there had been a waiver or forfeiture of the claim and (2) whether the plaintiff was sufficiently aware at the time of the sentence of the extent of the religious practices of Alcoholics Anonymous ("A.A.") that his failure to object to, or appeal from, his sentence [which included a probationary condition of attendance at A.A. meetings] should be deemed "a consent, or a waiver or forfeiture" of his § 1983 claims.[2] The Court further notes that, even if the issue had not been raised at trial, the Court should conduct a hearing to insure that the parties have an adequate opportunity to present evidence on the question, following which the Court should make findings.

### THE COUNTY'S ASSERTIONS AT TRIAL

■ Waiver is an affirmative defense. Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure it must be plead affirmatively by the defendant. It was not so plead in this action. The failure to so plead would have prohibited the making of such a claim at trial. *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 n. 2 (2d Cir.1988). Moreover, throughout the proceedings and at trial, the position of the defendant County was (and still is) that the A.A. program is not religious. Defendant conceded that the step meetings had a greater religious aspect than other types of meetings,[3] but claimed that the plaintiff never attended them and was never admonished for not attending them. *See* defendant's Rule 3(g) statement, ¶ 5, filed June 22, 1993. The plaintiff vigorously disputed this assertion, stating that he attended at least ten step meetings pursuant to the direction of his probation officer and further that, when he was offered an alternative treatment program at the Pious School in Orange County, that program also taught the Twelve Steps. While the defendant made a pre-trial motion to dismiss and filed a trial memorandum it did not raise, or even suggest, such an issue in its arguments.[4] Nor was such an issue raised on appeal, although it became one of the two central

date that it is to be vacated by an order of remand. Moreover, the Court of Appeals issued another order with respect to the petition for rehearing stating that the petition "is rendered moot in light of the amended opinion and order of remand issued May 14, 1997." That order suggests that the amended opinion still has vitality.

2. We are not entirely clear about the meaning intended by the use of the word "forfeiture." Waiver is defined as "the relinquishment or refusal to accept of a right" and "the intentional relinquishment of a known right." Bouvier's Law Dictionary Vol. 2 3417 (3d ed.1914). For the same definition *see* Black's Law Dictionary 1751–52 (4th ed.1957). Forfeiture on the other hand has numerous definitions, mostly related to the loss of property and its uses in admiralty law. Of course, if one waives his rights he may be said to have forfeited them. Thus, throughout these findings we will make no distinction between waiver and forfeiture.

3. Materials distributed by A.A. describe the various types of meetings as being:
  a. Open *speaker* meetings—open to alcoholics and nonalcoholics. (Attendance at an open A.A. meeting is the best way to learn what A.A. is, what it does, and what it does not do.) At speaker meetings, A.A. members "tell their stories." They describe their experiences with alcohol, how they came to A.A., and how their lives have changes as a result of A.A.
  b. Open *discussion* meetings—one member speaks briefly about his or her drinking experience, and then leads a discussion on any subject or drinking-related problem anyone brings up.
  (Closed meetings are for A.A.'s or anyone who may have a drinking problem.)
  c. Closed discussion meetings—conducted just as open discussions are, but for alcoholics or prospective A.A.'s only.
  d. Step meetings (usually closed) —discussion of one of the Twelve Steps.
  Plaintiff's Exhibit 3.

4. Defendant now argues that it raised the issue, but this Court failed to address it in its decision on defendant's first motion to dismiss, *Warner v. Orange County Dept. of Probation,* 827 F.Supp. 261 (S.D.N.Y.1993), or in the decision of the case, *Warner v. Orange County Dept. of Probation,* 870 F.Supp. 69 (S.D.N.Y.1994). In those motions, discussion of plaintiff's actions was confined to defendant's unsuccessful claims of collateral estoppel and judicial immunity.

issues in the dissent. *See Warner*, 115 F.3d 1068 (2d Cir.1997) (Winters, J., dissenting). However, there was evidence presented at trial from which an argument of waiver, if properly pled, could have been made, but was not.

There were only three witnesses at trial, the plaintiff, his probation officer, and the County's probation director (whose testimony was limited, and did not touch on any possible waiver issue). In addition, the parties filed a stipulation of facts which, for some reason, was not included in the record on appeal.[5] The plaintiff's testimony, as related to the waiver issue, was that he attended four or five A.A. meetings prior to sentencing on his lawyer's recommendation so that the Court would look more favorably at him at sentencing and perhaps give him probation. When he first met with his probation officer a month after his sentence, or soon thereafter, plaintiff told Terwilliger that he thought the meetings were religious and that he was an atheist. He nevertheless was directed to attend three meetings per week for the next couple of years. He did so. He described the various kinds of meetings that he attended, which later included the step meetings. He indicated that prayers were said at virtually all meetings. At the step meetings, he was expected to read aloud parts of the steps.[6] When asked to read portions from the book on the Twelve Steps, he refused. His explanation was that "[b]y reading from the step book I felt that I would have been practicing religion in a much more deeper sense. I felt the same way about it as if someone put a Bible in front of me and asked me to read a line from it, and that's offensive to me." Trial transcript pp. 37–38. At the first voluntary meeting he attended, he spoke on another subject, but thereafter refused to speak; this resulted in his feeling ostracized. On about four occasions, he specifically told his probation officer that he objected to the religious training to which he was being exposed. He formed the opinion over time that A.A. was a program of indoctrination, and that the program participants lied to him by telling him that the program was not religious, while at the same time telling him that he must pray in order to succeed in his rehabilitation. "The idea is to get you praying at all costs. Don't worry, it's not religious, just pray. After you are praying on a daily basis for so long, I think it's a brainwashing technique." Trial transcript p. 53.

On cross-examination, the plaintiff stated that the meetings he attended voluntarily before sentencing were held in various churches. At these meetings the Twelve Steps were discussed by persons in attendance and were presented in writing on a billboard.

The plaintiff's probation officer, Neal Terwilliger, also testified at trial. He indicated knowledge of the different types of A.A. meetings, but stated that he had never attended a step meeting. As to his familiarity with the A.A. program, he denied that it had any substantial religious content, other than recitation of the Lord's prayer at the end of each meeting. He stated that, in the meetings he had attended, there was no discussion of the Twelve Steps. He confirmed that, in December, 1990, he directed plaintiff to attend three A.A. meetings a week. He further directed plaintiff to attend step meetings in October, 1991 when he learned that plaintiff had not been attending them. He

---

**5.** Finding of Fact 16 is that "On January 23, 1991, plaintiff told Terwilliger that the Alcoholics Anonymous meetings were too religious based for him, that the Twelve Steps 'mentioned God, morals, tell God yourself.' Despite this conversation, Terwilliger continued to direct plaintiff to attend Alcoholics Anonymous meetings but that he could pick the meetings he would attend." Later Mr. Terwilliger specifically directed the plaintiff to attend step meetings.

**6.** The Twelve Steps are set forth in *haec verbae* in our decision, *Warner*, 870 F.Supp. 69, 70–71, and will not be repeated herein. The first three steps explicitly deny the possibility of recovery from

alcoholism without reliance on a higher power. As stated in the above referenced decision, the hard question is whether A.A. should be considered the exercise of religion. As the decision states, "[t]o one with only a passing knowledge of the A.A. program, the gut answer would probably be no. However the testimony and evidence in this case support the finding that the A.A. meetings plaintiff attended were the functional equivalent of religious exercise." *Warner*, 870 F.Supp. at 72. It is quite clear therefore that, while the steps allow some personal variation as to who and what God is, there is a substantial religious aspect in most of the steps.

also suggested that it would be wise for him to get the Twelve Step book. It was his belief that the Twelve Steps were talked about only at step meetings. As to the step meetings, he had been informed by other probationers that nobody requires you to speak. Terwilliger acknowledged that it was possible that the Twelve Steps were discussed at other types of meetings, depending on who was running them. However, at the meetings he had personally attended, God was not discussed. Although he acknowledged that the plaintiff had told him that the A.A. meetings were too religious, he was unaware at that time that the plaintiff was an atheist.

Based on the foregoing testimony, I find that, while there was some evidence to support the argument made in the dissenting opinion that plaintiff, knowing of the religious aspects, failed to object at sentencing or on appeal about the religious content of the A.A. programs, the County never raised this assertion at trial. Indeed, by virtue of its failure to plead waiver affirmatively, the County would have been foreclosed from making such an argument. Moreover, the assertion would have been directly contrary to its basic position that the A.A. program has no religious content.

### HEARING CONCERNING CONSENT OR WAIVER

The remand order directs this Court to conduct a hearing on the plaintiff's awareness of the extent of A.A.'s religious practices as bearing upon whether his failure to object to or appeal his sentence should be deemed waiver or consent. It further directs the Court to conduct a hearing to insure that both parties have an adequate opportunity to present evidence, following which the Court should make findings. From the above, we conclude that we are to determine, taking into account the additional evidence presented at the hearing, whether, if the issue had been properly presented at trial, this Court would have found consent or waiver.

The only witness called at the June 24, 1997 hearing was the plaintiff himself. The defendant called him, following which his own attorney cross-examined him. The following is a summary of his pertinent testimony.

Warner was arrested in February, 1990 for his third alcohol related driving infraction in a little more than a year. On September 4, 1990, he plead guilty and was sentenced November 13, 1990. He did not appeal the sentence. Based on the four or five meetings attended prior to sentencing, Warner was aware of religious aspects to A.A. meetings. However, the participants at the meetings told him that the program was not religious, but merely "spiritual". He became substantially more aware of the religious aspects of the program over time as he was exposed to the Twelve Steps. The Twelve Steps *per se*, were set forth on a billboard at the early meetings. At first he was open to the possibility that these steps could be worked by an atheist.[7] He did not consider the steps extensively until he had attended step meetings. Years later he read the book entitled Twelve Steps and Twelve Traditions, (Plaintiff's Exhibit 8), which expounds at greater length on the steps.

Warner first saw his probation officer within a month of being sentenced and, at that time or shortly thereafter, advised his probation officer that participation in A.A. was religious. His probation officer disagreed with him based upon the probation officer's own experience and information. Several times during the next two years, Warner voiced his objections to being required to participate in A.A. meetings. He then obtained the services of his present attorney, who is a noted Orange County civil rights lawyer. His attorney filed a motion with the Town Court challenging the constitutionality of the sentence. The County opposed the motion arguing that it was moot. The Town Justice found that the motion was in fact meet because suitable alternatives by then had been made by the probation depart-

---

**7.** Warner testified that he originally had been agnostic, but about ten years ago became an atheist. The distinction between the two, as we understand it, is that an agnostic has no religious belief in the existence of God, but has not developed a firm conviction that there is no God. An atheist is convinced that there is no God.

ment for plaintiff to participate in an alternative program.[8]

Prior to being sentenced, Warner had not attended a step meeting. He first did so about a year after commencing probation, at the insistence of his probation officer. In the beginning, plaintiff believed that the meetings were not necessarily religious, but that their hidden intent was. As mentioned earlier, he did not become fully aware of the religious intensity of the step meetings until he had attended several of them. Of course, he was aware of other religious aspects of the meetings, such as the recitation of prayers before and after every meeting. However, at the meetings, he was told that different people have different concepts as to what God is. He also was told that God could be anything, even a "spoon". The speakers at the A.A. meetings said that the Twelve Steps were not religious but were "spiritual". He tried to reconcile his own perceptions with what others were telling him, but he gradually decided that they were wrong and were attempting to trick him. His evaluation of the A.A. program, as found in the Twelve Steps and in the "Big Book", *Alcoholics*

*Anonymous,* (authorship not disclosed), as well as the speakers at the meeting, is that it is the loss of religion and belief in God that causes alcoholism. He was urged to pray even though he professed not to have any belief in God and prayer. He viewed these importations as being a form of brainwashing. His own experience was that he was capable of total abstinence from alcohol without any religious assistance and did so for a year. When he reached these conclusions, he obtained a new attorney, filed his unsuccessful motion in Town Court, and then commenced the instant action.

Based on the foregoing hearing testimony plus the evidence offered at trial, this Court makes the following findings of fact with respect to the issue directed by the remand order.

(1) The A.A. program for combatting addictive alcoholism is deeply religious.[9]

(2) The plaintiff perceived some of the religious aspects from his voluntary attendance at meetings before being sentenced.

(3) At these meetings, A.A. members attempted to convince him that their approach

8. The dissent in the no longer existing opinions states that:

> "as soon as the judge was alerted to Warner's distaste for the religious aspects of A.A., the judge immediately altered that condition of probation. That being the case, the record support for the finding that the judge merely rubberstamped the recommendation of the probation officer is not apparent to me."

*Warner, 115 F.3d at 1079* (2d Cir.1997). It appears that the change was not effected in exactly that fashion.

9. The dissent notes that the Establishment Clause interpretation in our decision, if followed, would endanger a number of penal programs that are commonly practiced, such as having prison chaplains who offer religious counselling and services and community service at soup kitchens operated by churches. We agree with that observation. Indeed in our earlier decision on defendant's motion to dismiss we had noted:

> The Supreme Court's treatment of the Establishment Clause has undergone substantial changes during the last half of this century, questioning practices that were common during the first 150 years following the passage of the First Amendment. We suspect that we have not seen the last of these changes. The Supreme Court once noted that "[w]e are a religious people whose institutions presuppose

a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952).
*Warner,* 827 F.Supp. at 264.
In addition, in our decision in this case we state:

> We admit some personal doubt that the current appellate interpretation of the Establishment Clause is consistent with the intentions of the Framers at the time the First Amendment was passed. The Framers were particularly concerned that there be no established religion such as had existed in England and other European countries, and which had caused numerous wars and uprisings. They were not, however, opposed to the public observation of religion in a non-denominational sense. This attitude persisted through the nineteenth century, and indeed even today some official, non-denominational religious practices persist, such as the presence of chaplains in the military service and in the Congress, and the words "In God We Trust" on our currency. However, in this century, consideration for the rights and attitudes of atheists and agnostics (as well as for non-Christian religions) has led to a much stricter view of what constitutes a violation of the Establishment Clause. We are of course compelled to follow the Supreme Court's teachings in this regard.

*Warner,* 870 F.Supp. at 73 n. 2.

was not religious only "spiritual". His probation officer subsequently agreed that the A.A. program was not religious.[10]

(4) Over a period of two years, Warner ultimately became convinced that the A.A. program *was* religious, and that he was being subjected to religious indoctrination. He then commenced the legal proceedings leading to the present hearing.

■ The order of remand calls for this Court to make "findings" and makes no reference to conclusions of law. However, it does envision the possibility of our amending the earlier judgment. Waiver is a mixed question of fact and law. *See, e.g., Moynahan v. Manson,* 419 F.Supp. 1139, 1143 n. 12 (D.Conn.1976), *aff'd,* 559 F.2d 1204 (2d Cir.), *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977). Consequently, we make a further finding, which is in part a conclusion of law, to indicate why we are not amending our earlier judgment.

■ A waiver of a constitutional right must be voluntary, knowing and intelligent. *United States v. Morgan,* 51 F.3d 1105, 1110 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995). The act of waiver must be shown to have occurred with awareness of its consequences. *Id.* Waiver is an intentional relinquishment or abandonment of a known right or privilege. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The waiver or loss of any fundamental right can neither "be presumed nor may it be lightly inferred." *United States v. Mapp,* 476 F.2d 67, 77 (2d Cir.1973)(internal citations omitted). The Court must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023. *See also Doe v. Marsh,* 105 F.3d 106, 110–111 (2d Cir.1997). Whether a defendant knowingly and voluntarily waived his rights "nay only be determined after a careful evaluation of the totality of all surrounding circumstances...." *United States*

*v. Lynch,* 92 F.3d 62, 65 (2d Cir.1996), *quoting United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991).

■ The plaintiff ultimately reached the conclusion that performance of his probationary obligations, as required by his sentence, violated his constitutional rights. He was not asked when he reached that conclusion. However, since factually he was uncertain about the correctness of his involvement in religion, there is no reason to assume he had a firm conviction that A.A. was intensely religious at the time of his sentencing. Consequently, we do not find, based on the totality of the facts, that his failure to object or appeal was knowing and intelligent. Moreover, his initial inaction was decidedly influenced by the possibility that any objections or non-compliance could lead to a jail sentence or revocation of probation. As the Supreme Court held in *Minnesota v. Murphy,* 465 U.S. 420, 435, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984), where the state expressly or impliedly asserts that "invocation of the privilege would lead to revocation of probation, it would have created the classical penalty situation, the failure to assert the privilege would be excused, and the prisoner's answers would be deemed compelled and inadmissible in a criminal prosecution." *See also United States v. Oliveras,* 905 F.2d 623, 627 (2d Cir.1990). Had Warner, during his probationary period, refused to attend the A.A. meetings, he would have been in a "classic penalty situation". Indeed, had he attempted to assert such a claim prior to sentencing, he ran the risk that the defendant, instead of recommending a probationary period, would have recommended a jail term. In light of the foregoing, we find that the plaintiff did not waive, when sentenced, his right to make a subsequent objection to a violation of his constitutional rights.

■ The remand order directs that we consider whether plaintiff's inactions should be deemed "a consent, or a waiver or forfei-

---

10. We are at a loss to understand the position taken by the probation department and the probation officer in that regard. It is possible that they are making a distinction between specific religious beliefs and more general ones. The A.A. approach is non-denominational and would

be acceptable to most adherents of main line religions, except perhaps certain of those from the Far East. However, in the general sense of adopting the belief that there is a supreme being interested in, and overseeing, human behavior, the A.A. approach is clearly religious.

ture ..." *Warner,* 115 F.3d at 1082. Consent, of course, can be part of a waiver. However, we believe the term is used in the context expressed in the dissent, which speaks of consent to an intentional tort. Consent is defined as "[a] concurrence of wills. Voluntary yielding the will to the proposition of another." Black's Law Dictionary 377 (4th ed.1957). The dictionary notes that there is a difference between submission and consent. *Id.* In not objecting to the probationary sentence, Warner was submitting to the lesser of two evils, not voluntarily agreeing to it. Moreover, the dissent cites to *Van Vooren v. Cook,* 273 A.D. 88, 75 N.Y.S.2d 362 (1947), which stands for the proposition that you can consent to having someone hit you, which would be a defense to a suit for battery. *Id.* 75 N.Y.S.2d at 365. Clearly you can. But someone who sticks his chin out and says, "hit me," still may have a claim if, after being hit and knocked down, he then is stomped into unconsciousness by his assailant. "[T]he physical attack must not exceed the consent." *Van Vooren v. Cook,* 75 N.Y.S.2d at 366. If Warner consented to anything, it was his, initial attendance at meetings as part of his probation. If he thereafter learned that he was embarking on a more insistent philosophical indoctrination than he anticipated, it cannot be said that he consented to that or, under the facts of this case, reasonably foresaw it. We therefore adhere to our earlier judgment.